ORIGINAL

1 | David S. McLeod (SBN: 66808)
DEWEY BALLANTINE LLP
2 | 333 South Grand Avenue
Los Angeles, California 90071-1530
3 | Telephone: (213) 621-6000
Facsimile: (213) 621-6100

4 |
Lawrence M. Hill
5 | Seth C. Farber
DEWEY BALLANTINE LLP
6 | 1301 Avenue of the Americas
New York, New York 10019-6092
7 | Telephone: (212) 259-8000
Facsimile: (212) 259-6333

8 |
Attorneys for Defendants
9 | DEUTSCHE BANK AG, DEUTSCHE
BANK SECURITIES INC., d/b/a
10 | DEUTSCHE BANK ALEX. BROWN,
A DIVISION OF DEUTSCHE BANK
11 | SECURITIES INC., CRAIG BRUBAKER,
PHILLIP MILES, AND PAUL YOUNG
12 |



CLERK, U.S. FILED DISTRICT COURT
FEB - 4 2005
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

13 |
14 |                IN THE UNITED STATES DISTRICT COURT
15 |           FOR THE CENTRAL DISTRICT OF CALIFORNIA
16 |                      SOUTHERN DIVISION

17 | ROBERT L. BARRON, *et al.*,            ) No. SACV04-0401 AHS (ANx)
                                          )
18 |        Plaintiffs,                    ) **THE DEUTSCHE BANK**
                                          ) **DEFENDANTS' NOTICE OF**
19 |    vs.                                ) **MOTION AND MOTION TO**
                                          ) **DISMISS; MEMORANDUM OF**
20 | DEUTSCHE BANK AG, *et al.*,           ) **POINTS AND AUTHORITIES IN**
                                          ) **SUPPORT THEREOF;**
21 |        Defendants.                    ) **DECLARATION OF DAVID S.**
                                          ) **McLEOD**
22 |                                       )
                                          ) Honorable Alicemarie H. Stotler
23 |                                       ) DATE      MARCH 28, 2005
                                          ) TIME      10 A.M
24 |                                       ) COURTROOM 10-A
25 |  _____       )

26 |
27 |                    
                        DOCKETED ON CM
28 |                    FEB - 8 2005
                        BY            040                    

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., d/b/a Deutsche Bank Alex. Brown, Craig Brubaker, Phillip Miles, and Paul Young (the "Deutsche Bank Defendants"), will and hereby do move to dismiss the plaintiffs' claims pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

The Deutsche Bank Defendants move to dismiss on the grounds that (1) Plaintiffs' RICO claim is barred by federal statute and plaintiffs fail to allege a cognizable RICO claim; (2) Plaintiffs fail to state a cognizable state law claim; and (3) Plaintiffs fail to plead their fraud-based claims with the degree of particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. Accordingly, Plaintiffs' complaint should be dismissed as to the Deutsche Bank Defendants.

The Deutsche Bank Defendants' Motion to Dismiss is based upon this Notice of Motion, the attached Memorandum of Points and Authorities, and the attached declaration of David S. McLeod. Deutsche Bank makes this Motion following the conference of counsel, which took place on January 31, 2005.

Dated:  February 4, 2005

DEWEY BALLANTINE LLP
David S. McLeod

By: _____
David S. McLeod

*Attorneys for Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., d/b/a Deutsche Bank Alex. Brown, Craig Brubaker, Phillip Miles and Paul Young*

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

1   David S. McLeod (SBN: 66808)
    DEWEY BALLANTINE LLP
2   333 South Grand Avenue
    Los Angeles, California 90071-1530
3   Telephone: (213) 621-6000
    Facsimile: (213) 621-6100
4
    Lawrence M. Hill
5   Seth C. Farber
    DEWEY BALLANTINE LLP
6   1301 Avenue of the Americas
    New York, New York 10019-6092
7   Telephone: (212) 259-8000
    Facsimile: (212) 259-6333
8
    Attorneys for Defendants
9   DEUTSCHE BANK AG, DEUTSCHE
    BANK SECURITIES INC., D/B/A
10  DEUTSCHE BANK ALEX. BROWN, A
    DIVISION OF DEUTSCHE BANK
11  SECURITIES INC., CRAIG BRUBAKER,
    PHILLIP MILES, AND PAUL YOUNG
12

        **IN THE UNITED STATES DISTRICT COURT**

13

        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14

        **SOUTHERN DIVISION**

15

16  ROBERT L. BARRON, *et al.*,          ) Case No. SACV04-0401 (AHS) (ANx)

17          Plaintiffs,                   ) **THE DEUTSCHE BANK**
                                          ) **DEFENDANTS' MEMORANDUM**
18      vs.                               ) **IN SUPPORT OF THEIR MOTION**
                                          ) **TO DISMISS**
19  DEUTSCHE BANK AG, *et al.*,           )
                                          ) Date:        February 28, 2005
20          Defendants.                   ) Time:        1:30 p.m.
                                          ) Courtroom:   10A
21                                        )
                                          ) Honorable Alicemarie H. Stotler
22                                        )
                                          )
23  _____          )

24

25

26

27

28

*(left margin, vertical text)* DEWEY BALLANTINE LLP  333 South Grand Avenue  Los Angeles, California 90071-1530

# TABLE OF CONTENTS

PRELIMINARY STATEMENT................................................................................1

ARGUMENT .......................................................................................................3

I.     PLAINTIFFS' CLAIMS FAIL TO STATE A CAUSE OF ACTION ........3

    A.    Plaintiffs' RICO Claims Must Be Dismissed.......................................3

        1.    Plaintiffs' RICO Claims Are Barred By The PSLRA ...............3

        2.    Plaintiffs Fail To Establish RICO Standing..............................6

        3.    Plaintiffs Fail To Allege A Pattern of Racketeering
             Activity.....................................................................................8

             a.    Plaintiffs Do Not Allege Closed-Ended Continuity .................9

             b.    Plaintiffs Do Not Allege Open-Ended Continuity..................10

        4.    Plaintiffs Do Not Allege A Cognizable RICO Enterprise
             Or
             The Deutsche Bank Defendants' Participation In Its
             Operation Or Management......................................................10

        5.    The § 1962(a) Claim Fails To Allege An Injury From
             The Investment Of Racketeering Income ...............................12

        6.    The RICO Conspiracy Claim Must Be Dismissed
             Because Plaintiffs' Substantive RICO Claims Are
             Deficient.................................................................................13

        7.    The RICO Aiding and Abetting Claim Must Be
             Dismissed ...............................................................................14

    B.    The State Law Claims Must Be Dismissed.........................................14

        1.    Plaintiffs Fail To State A Claim For Unjust Enrichment.........14

        2.    Plaintiffs Fail To State A Claim For Breach Of Contract
             Or Breach Of The Duty Of Good Faith And Fair Dealing ......15

        3.    Plaintiffs Fail To State A Claim For Breach Of Fiduciary
             Duty.......................................................................................17

        4.    Plaintiffs Fail To State A Claim For Fraud.............................19

        5.    Plaintiffs State No Claim For Civil Conspiracy ......................20

        6.    Plaintiffs State No Claim Under The California Unfair
             Competition Law.....................................................................20

        7.    Plaintiffs Are Not Entitled To Declaratory Judgment .............22

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEWEY BALLANTINE LLP**
333 South Grand Avenue
Los Angeles, California 90071-1530

II.     THE FRAUD-BASED CLAIMS DO NOT SATISFY RULE 9(b)............22

CONCLUSION ....................................................................................................24

TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Agency Dev., Inc. v. Medamerica Ins. Co. of New York,*
No. 02-CV-6663L, 2004 WL 1570259 (W.D.N.Y. June 17, 2004) ............ 16

*Aquino v. Credit Control Servs.,*
4 F. Supp. 2d 927 (N.D. Cal. 1998) ...................................................... 21, 22

*Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.,*
189 F.3d 321 (3d Cir. 1999) ....................................................................... 3

*Bank of China v. NBM LLC,*
359 F.3d 171 (2d Cir. 2004) ....................................................................... 6

*Baumer v. Pachl,*
8 F.3d 1341 (9th Cir. 1993). ..................................................................... 17

*Breindel & Ferstendig v. Willis Faber & Dumas Ltd.,*
No. 95 Civ. 7905, 1996 WL 413727 (S.D.N.Y. July 24, 1996) ................... 18

*Bush v. Loanstar Mortgagee Services, L.L.C.,*
286 F. Supp. 2d 1210 (N.D. Cal. 2003) .................................................... 21

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,*
20 Cal. 4th 163 (1999) ............................................................................. 21

*Central Bank of Denver v. First Interstate Bank,*
511 U.S. 164 (1994) ................................................................................. 14

*Chang v. Chen,*
80 F.3d 1293 (9th Cir. 1996) .................................................................... 11

*Chaset v. Fleer/Skybox Int'l, LP,*
300 F.3d 1083 (9th Cir. 2002) .................................................................... 6

*Compania Sud-Americana de Vapores S.A. v. IBJ Schroder Bank & Trust
Co.,*
785 F. Supp. 411 (S.D.N.Y. 1992) ............................................................ 17

*Dep't of Econ. Dev. v. Arthur Andersen & Co.,*
924 F. Supp. 449 (S.D.N.Y. 1996) ...................................................... 11, 12

*Durning v. Citibank, Int'l,*
990 F. 2d 1133 (9th Cir. 1993) ............................................................. 9, 10

*Feeley v. Whitman Corp.,*
65 F. Supp. 2d 164 (S.D.N.Y. 1999) .......................................................... 8

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.,*
17 F. Supp. 2d 275 (S.D.N.Y. 1998) ........................................................ 15

*H.J. Inc. v. Northwestern Bell Tel. Co.,*
492 U.S. 229 (1989)........................................................................ 8, 9, 10

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

iii

**DEWEY BALLANTINE LLP**
333 South Grand Avenue
Los Angeles, California 90071-1530

*Hokama v. E.F. Hutton & Co.,*
    566 F. Supp. 636 (C.D. Cal. 1983) ........................................................... 23, 24

*Holmes v. Sec. Investor Prot. Corp.,*
    503 U.S. 258 (1992) ................................................................................. 6

*Howard v. AOL Inc.,*
    208 F.3d 741 (9th Cir. 2000) ................................................................ 3, 13

*I.L.G.W.U. v. Nat'l Ret. Fund v. Cuddlecoat, Inc.,*
    No. 01 Civ. 4019, 2004 WL 444071 (S.D.N.Y. Mar. 11, 2004) ................. 20

*In re Joint E. & S. Dist. Asbestos Litig.,*
    14 F.3d 726 (2d Cir. 1993) ...................................................................... 22

*In re Koreag, Controle et Revision S.A.,*
    961 F.2d 341 (2d Cir. 1992) .................................................................... 18

*In re Valence Tech. Sec. Litig.,*
    No. C 95-20 459, 1996 WL 37788 (N.D. Cal. Jan. 23, 1996) ..................... 7

*Jaffe v. Paramount Communs. Inc.,*
    644 N.Y.S.2d 43 (N.Y. App. Div. 1996) ................................................. 17

*Laikin v. Vaid,*
    Index No. 604996/00, 2001 WL 1682873 (N.Y. Sup. Ct. Oct. 10,
    2001) ....................................................................................................... 17

*Landreth Timber Co. v. Landreth,*
    471 U.S. 681 (1985) .................................................................................. 4

*Lewis v. Rosenfeld,*
    138 F. Supp. 2d 466 (S.D.N.Y. 2001) ..................................................... 20

*Loftin v. KPMG, LLC.,*
    No. 02 Civ. 81166, 2003 WL 222562 (S.D. Fla. Sept. 10, 2003) ................ 4

*MMT Sales Inc. v. Channel 53 Inc.,*
    No. 92 Civ. 7207 (SS), 1993 WL 541242 (S.D.N.Y. Dec. 27, 1993) ......... 14

*Moniz v. GM Corp.,*
    No. C98-4913, 2000 WL 1375285 (N.D. Cal. Sept. 18, 2000) .................... 8

*Moore v. Kayport Pkg. Express, Inc.,*
    885 F.2d 531 (9th Cir. 1989) ............................................................... 4, 22

*Nugget Hydroelec., L.P. v. PG&E Co.,*
    981 F.2d 429 (9th Cir. 1992) .............................................................. 12, 13

*Ouaknine v MacFarlane,*
    897 F.2d 75 (2d Cir. 1990) ...................................................................... 12

*Paper Corp. of United States v. Schoeller Technical Papers, Inc.,*
    807 F. Supp. 337 (S.D.N.Y. 1992) .......................................................... 15

*Pillsbury, Madison & Sutro v. Lerner,*
    31 F.3d 924 (9th Cir. 1994) ........................................................ 6

*Qarbon.com Inc. v. eHelp Corp.,*
    315 F. Supp. 2d 1046 (N.D. Cal. 2004) ..................................... 21

*Reda v. Eastman Kodak Co.,*
    649 N.Y.S.2d 555 (N.Y. App. Div. 1996) ................................. 16

*Religious Tech. Ctr. v. Wallersheim,*
    971 F.2d 364 (9th Cir. 1992) ...................................................... 9

*Renick v. Dun & Bradstreet Receivable Mgt. Servs.,*
    290 F.3d 1055 (9th Cir. 2002) .................................................. 21

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993) .................................................................. 11

*Rich v. Maidstone Fin., Inc.,*
    No. 98 CIV. 2569, 2001 WL 286757 (S.D.N.Y. Mar. 23, 2001) ................ 19

*Rolo v. City Investing Co. Liquidating Trust,*
    155 F.3d 644 (3d Cir. 1998) ...................................................... 14

*Ross v. CCS Int'l Ltd.,*
    No. 98 CV 4090 (RO), 2000 WL 1804103 (S.D.N.Y Dec. 8, 2000) ........... 20

*Ruckle v. Roto American Corp.,*
    339 F.2d 24 (2d Cir. 1964) .......................................................... 4

*Schlaifer Nance & Co. v. Estate of Andy Warhol,*
    119 F.3d 91 (2d Cir. 1997) .......................................................... 9

*Scripps Clinic v. Superior Court,*
    108 Cal. App. 4th 917 (2003) .................................................... 21

*S.E.C. v. Abacus Int'l Holding Corp.,*
    No. C 99-02191, 2001 WL 940913 (N.D. Cal. Aug. 16, 2001) ................... 6

*S.E.C. v. Gallard,*
    No. 95 Civ. 3099, 1997 WL 767570 (S.D.N.Y. Dec. 10, 1997) ................... 6

*Seippel v. Jenkins & Gilchrest, P.C.,*
    No. 03 Civ. 6942 (SAS), 2004 WL 1907315 (S.D.N.Y. Aug. 25,
    2004) .................................................................................. 18, 20

*Simon v. Value Behavioral Health, Inc.,*
    208 F.3d 1073 (9th Cir. 2000) .................................................. 12

*Small v. Lorillard Tobacco Co.,*
    720 N.E.2d 892 (N.Y. 1999) ...................................................... 19

*Sutton Assocs. v. Lexis-Nexis,*
    761 N.Y.S.2d 800 (N.Y. Sup. Ct. 2003) .................................... 17

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

v

*State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada,*
  374 F.3d 158 (2d Cir. 2004) .................................................................. 16

*Sterbenz v. Attina,*
  205 F. Supp. 2d 65 (S.D.N.Y. 2002) ....................................................... 16

*Swartz v. KPMG LLC, et al.,*
  No. C03-1252P (W.D. Wash. Feb. 13, 2004) ............................................. 8

*Tate v. PG&E Co.,*
  230 F. Supp. 2d 1072 (N.D. Cal. 2002) .................................................... 9

*Union Station Assocs. LLC v. Puget Sound Energy, Inc.,*
  238 F. Supp. 2d 1226 (W.D. Wash. 2002) ................................................ 22

*United States v. Turkette,*
  452 U.S. 576 (1981) ............................................................................. 10

*Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.,*
  87 F.3d 604 (2d Cir. 1996) ................................................................... 15

*Vess v. Ciba-Geigy Corp. USA,*
  317 F.3d 1097 (9th Cir. 2003) ............................................................... 22

*Wagh v. Metris Direct, Inc.,*
  363 F.3d 821 (9th Cir. 2003) ................................................................ 13

*Westways World Travel v. AMR Corp.,*
  182 F. Supp. 2d 952 (C.D. Cal. 2001) .................................................... 14

*Wolff v. Rare Medium, Inc.,*
  210 F. Supp. 2d 490 (S.D.N.Y. 2002) ..................................................... 15

**Statutes and Rules**

15 U.S.C. § 78j(b) ................................................................................... 4, 5

15 U.S.C. §§ 77b(a)(1), 78c(a)(10) .............................................................. 5

18 U.S.C. § 1961(4) .................................................................................. 10

18 U.S.C. § 1962(c) .................................................................................. 10

18 U.S.C. § 1962(d) .................................................................................. 13

18 U.S.C. § 1964(c) ................................................................................... 3

Cal. Bus. & Prof. Code § 17200 ................................................................ 14

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

1    Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., d/b/a

2   Deutsche Bank Alex. Brown (collectively, "Deutsche Bank" or the "Bank"), Craig

3   Brubaker, Phillip Miles, and Paul Young (together with the Bank, the "Deutsche

4   Bank Defendants") move pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules

5   of Civil Procedure to dismiss with prejudice Counts I, II, III, IV (RICO), V

6   (Declaratory Judgment and Unjust Enrichment), VI (Breach of Contract and

7   Breach of Duty of Good Faith and Fair Dealing), VII (Breach of Fiduciary Duty),

8   VIII (Fraud), XI (Declaratory Judgment), XII (Civil Conspiracy), and XIII (Cal.

9   Bus. & Prof. Code § 17200).[1]

10                          **PRELIMINARY STATEMENT**

11          This action is brought by four groups of wealthy investors and their

12   affiliated entities (aggregated in the Complaint as the Barron, Daviscourt, Wolfson,

13   and Johnson Plaintiffs) who pursued tax-advantaged strategies involving

14   investments in foreign exchange ("FX") digital options contracts and swaps

15   (collectively, the "Strategies").  Plaintiffs realized substantial tax savings from the

16   Strategies, but, now that the IRS has challenged the savings, they claim they were

17   misled by the attorneys and accountants who advised them and by Deutsche Bank,

18   the financial institution that executed the transactions.   Their claims must be

19   dismissed for the following reasons.

20          *First*, the RICO claims fail for several reasons:

21    •   Under the Private Securities Litigation Reform Act of 1995 (the

22        "PSLRA"), the alleged predicate acts cannot serve as the basis of a

23        RICO claim because they could have been pled as securities fraud;

24    •   Plaintiffs lack RICO standing;

---

[1]   The Deutsche Bank Defendants submit this motion to dismiss without prejudice
to (i) their right to compel arbitration at the appropriate time and (ii) their
pending motion to the United Stated Court of Appeals for the Ninth Circuit to
stay this action pending appeal of this Court's December 31, 2004 Order
denying the Deutsche Bank Defendants' Motion to Stay the Proceedings.

- The Complaint does not adequately allege (a) a pattern of racketeering activity, (b) a RICO enterprise and the Deutsche Bank Defendants' participation in the operation or management of it, or (c) the investment of racketeering income; and

- There is no civil aiding and abetting liability under RICO.

  *Second,* the state law claims fail as well because:

- An equitable claim for unjust enrichment cannot be asserted where, as here, there are valid contracts between the parties;

- The claim for breach of the duty of good faith and fair dealing does not allege that the Deutsche Bank Defendants exercised their discretion under the FX contracts in an arbitrary or irrational manner or that their conduct injured Plaintiffs' rights under the contracts;

- The breach of fiduciary duty claim fails because the Deutsche Bank Defendants and Plaintiffs had a contractual, *not* a fiduciary, relationship;

- The fraud claim fails for lack of justifiable reliance;

- The civil conspiracy claim fails because Plaintiffs have not alleged an independent actionable tort;

- The Cal. Bus. & Prof. Code § 17200 claim fails because there are no viable allegations of (a) violations of any other law; (b) facts establishing that the Deutsche Bank Defendants' conduct poses a threat to the public at large; or (c) any connection between the allegedly "unfair" conduct and any constitutional, statutory or regulatory provisions; and

- Plaintiffs are not entitled to declaratory relief because they have not sufficiently alleged any claim against the Deutsche Bank Defendants.

  *Third,* the Complaint fails to plead the fraud-based claims with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure.

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

-2-

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

**ARGUMENT**

**I.      PLAINTIFFS' CLAIMS FAIL TO STATE A CAUSE OF ACTION**

    **A.      Plaintiffs' RICO Claims Must Be Dismissed**

        **1.      Plaintiffs' RICO Claims Are Barred By The PSLRA**

Plaintiffs' attempt to frame their fraud allegations as a RICO claim is barred by the PSLRA, which amended RICO to provide that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962" unless there has been a prior criminal conviction for that conduct.  18 U.S.C. § 1964(c); *see also Howard v. AOL Inc.*, 208 F.3d 741, 749 (9th Cir. 2000).  This provision not only bars RICO claims that explicitly allege securities fraud, but bars RICO claims that could have been pled as securities fraud, as well.  As one Court of Appeals has noted, the legislative history of the PSLRA makes clear that "the amendment was intended not simply to 'eliminate securities fraud as a predicate offense in a civil RICO action,' but also to prevent a plaintiff from 'plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 327 (3d Cir. 1999) (*quoting* H.R. Conf. Rep. No. 104-369, at 47 (1995)).

Plaintiffs' claims are barred by the PSLRA for at least two, independent reasons.  As a first reason, Plaintiffs allege that they were misled into entering into the Strategies through misrepresentations about the tax consequences of securities sales implemented in connection with those Strategies.  Plaintiffs claim that, as a result of those misrepresentations, they entered into a complex series of transactions designed, for example, to inflate the basis of certain securities that they had contributed to S Corporations that they formed in connection with the Strategies.  Compl. ¶79.  The gist of Plaintiffs' Complaint is that the Defendants fraudulently represented that certain assets, including stock, would have a higher

1   tax basis than they in fact did and that, as a result of these misrepresentations,

2   Plaintiffs contributed stock to their S Corporations which then sold the stock with

3   an "artificially inflated basis" in order to generate what the Plaintiffs mistakenly

4   believed was "a substantial unrealized short term capital loss."[2]  Compl. ¶ 79e.[3]

5         Although couched in terms of mail and wire fraud, this claim is

6   plainly one that could have been alleged as securities fraud.  Two recent cases

7   illustrate the point.  In *Loftin v. KPMG, LLC.*, No. 02 CIV 81166, 2003 WL

8   2225621 (S.D. Fla. Sept. 10, 2003), the plaintiff pleaded a similar RICO claim

9   based on mail and wire fraud predicates based on similar alleged

10  misrepresentations regarding a tax strategy transaction.   The court dismissed

11  Loftin's RICO claim, concluding that "[s]ince the conduct on which [plaintiff]

12  relies [as alleged predicate acts of mail and wire fraud] is conduct that would be

13  actionable under 15 U.S.C. § 78j(b) and SEC Rule 10b-5, the PSLRA bar applies

14  to warrant dismissal of [plaintiff's] RICO claim with prejudice."   *Id.* at *5.

15  Similarly, in *Swartz v. KPMG, LLC*, No. C03-1252P, slip op. at 8 (W.D. Wash.

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

16  [2]  For example, the Wolfson Plaintiffs allege that they engaged in purchases and

17  sales of Brocade Communications Systems, Inc., Cisco Systems, Inc., Compaq
    Computer Corp., Nortel Networks Corp. Oracle Corp. and Siebel Systems, Inc.

18  as part of the Strategies.  Compl. ¶¶ 116-19.  Other Plaintiffs make similar

19  allegations.  *See, e.g.*, Compl. ¶¶ 103-05 (Barron Plaintiffs' transactions in
    Lucent Technologies, Inc. options); ¶ 136 (Daviscourt Plaintiffs' purchase of

20  shares of Motorola, Inc.); ¶¶ 157-62 (Johnson Plaintiffs' transactions in shares

21  of MCI WorldCom Inc. and AT&T Corp.).

22  [3]  Plaintiffs also created their S Corporations as part of the Strategies.  *See* Compl.
    ¶¶ 79, 83, 89-90, 107-08, 121-22, 148, 164-65.  The shares in these corporations

23  are also securities.  *See, e.g., Landreth Timber Co. v. Landreth*, 471 U.S. 681,

24  693-94 (1985) (stock in a closely-held corporation is a security); *Moore v.*

25  *Kayport Pkg. Express, Inc.*, 885 F.2d 531, 533 (9th Cir. 1989) (limited
    partnership interests were securities within meaning of federal securities laws).

26  Thus, the issuance of these shares to Plaintiffs as part of the Strategies also

27  constitutes a "sale" under the federal securities laws. *Ruckle v. Roto American*
    *Corp.*, 339 F.2d 24, 27 (2d Cir. 1964).  Plaintiffs' RICO claims are barred by the

28  PSLRA for this reason, as well.

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

1   Feb. 13, 2004) (Declaration of David S. McLeod, executed February 4, 2005, Ex.

2   43), the court dismissed a RICO claim, finding that the "sale of plaintiff's . . .

3   stock in connection with this allegedly fraudulent tax shelter scheme brings it

4   squarely within the ambit of a cause of action for securities fraud." *See also*

5   *Seippel v. Jenkens & Gilchrest, P.C.*, 03 Civ. 6942 (SAS), 2004 WL 1907315, at

6   *4-6 (S.D.N.Y. Aug. 25, 2004) (dismissing RICO claim under PSLRA where

7   plaintiff claimed he sold securities after receiving allegedly fraudulent advice on

8   how he could shelter the resulting gain).  For the same reasons, this Court should

9   dismiss Plaintiffs' claims of a RICO violation arising out of alleged

10  misrepresentations regarding the tax consequences of securities transactions

11  executed as part of the Strategies.

12          As a second reason, Plaintiffs allege that, as part of the Strategies,

13  they were deceived into purchasing "certain foreign exchange digital option

14  contracts," referred to in the Complaint as "FX Contracts." Compl. ¶¶ 33, 39, 43.

15  Foreign currency options are securities if they are entered into on a national

16  securities exchange. *See* 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). Here, while the FX

17  Contracts were not traded on a national securities exchange, Plaintiffs allege that

18  they were tricked into believing that they were, and claim that the FX Contracts

19  that they received were not the securities that they were allegedly promised.

20  Specifically, Plaintiffs allege:

21          the FX Contracts were not something traded on any recognized

22          exchange but were simply a matter of private contract between the

23          participants. . . .  [N]either party had any rights to take possession of

24          the "underlying currency." As a result, the FX Contracts amounted, in

25          actuality, to a contractual wager (*i.e.*, a "bet") based on movements in

26          foreign currency prices, without any real possibility of foreign

27          currency ever changing hands between the parties.

28  Compl. ¶ 36, n.6; *see also id.* ¶42.

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

The claim that Plaintiffs were misled about the nature of their investment is also a securities fraud claim. The federal securities laws protect investors who intend to purchase securities regardless of whether the securities in fact exist. *See, e.g., S.E.C. v. Gallard*, No. 95 Civ. 3099, 1997 WL 767570, at *3 (S.D.N.Y. Dec. 10, 1997) ("It is clear by now that the antifraud provisions relied upon by the Commission are applicable even where, as here, the 'security' at issue does not exist."); *S.E.C. v. Abacus Int'l Holding Corp.*, No. C 99-02191, 2001 WL 940913 (N.D. Cal. Aug. 16, 2001) (SEC pled prima facie case of Securities Act violation where defendant was accused of selling non-existent financial instruments and investments). Plaintiffs allege that they purchased, but did not receive, an investment in exchange-traded foreign currency option contracts. Thus, they allege that they were defrauded in connection with the purchase of a security, and the PSLRA therefore bars Plaintiffs' RICO claims.

## 2.    Plaintiffs Fail To Establish RICO Standing

In addition, the Complaint does not establish RICO standing. To do so, Plaintiffs must allege that their injuries were proximately caused by the prohibited conduct and that they suffered a concrete financial loss. *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1086 (9th Cir. 2002).

The proximate causation requirement "requires that there must be a direct relationship between the injury asserted and the injurious conduct alleged." *Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 928 (9th Cir. 1994) (internal citation omitted); *see also Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).[4] Plaintiffs' attempt to allege proximate cause fails because they cannot allege reasonable reliance on any alleged representations by the Deutsche Bank Defendants. Any reliance would be unreasonable given the representations

---

[4] When RICO claims are based upon predicate acts of mail fraud, "the proximate cause element articulated in *Holmes* requires the plaintiff to show 'reasonable reliance.'" *Bank of China v. NBM LLC*, 359 F.3d 171, 176 (2d Cir. 2004).

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

Plaintiffs made when entering into the transactions.  As part of the Strategies, Plaintiffs executed agreements confirming the terms of the investments entered into with Deutsche Bank (the "Confirmations").[5]  The Confirmations state:

> [Plaintiffs are] acting for [their] own account, and [they] ha[ve] made [their] own independent decisions to enter into [the] Transaction and as to whether the Transaction is appropriate or proper for [them] based upon [their] own judgment and upon advice from such advisers as [they] deemed necessary.  [They are] not relying on any communication (written or oral) of [Deutsche Bank] including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into [the] Transaction, it being understood that information and explanations related to the terms and conditions of [the] Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction.  No communication (written or oral) received from [Deutsche Bank] shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

---

[5] This Court may consider the Confirmations because they are integral to and referred to in the Complaint, *see, e.g.*, Compl. ¶¶ 92, 111, 125, 128, 131, 152, 168, although not attached to it. *See In re Valence Tech. Sec. Litig.*, No. C 95-20459, 1996 WL 37788, at *3 (N.D. Cal. Jan. 23, 1996).

McLeod Decl., Exs. 21-42.[6]   Accordingly, Plaintiffs cannot, as a matter of law, have reasonably relied upon any representations or omissions by the Deutsche Bank Defendants, and, thus, cannot demonstrate the causation necessary to establish RICO standing.   *Swartz*, slip op. at 8 (W.D. Wash. Feb. 13, 2004) (McLeod Decl., Ex. 43) (dismissing RICO claim with prejudice in case involving similar tax strategy and finding no reasonable reliance as a matter of law "where there are written documents which contradict any oral statements"); *see also Moniz v. GM Corp.*, No. C98-4913, 2000 WL 1375285, at *4 (N.D. Cal. Sept. 18, 2000) (unambiguous disclaimers in written agreement decisively refute any allegations of reasonable reliance); *Feeley v. Whitman Corp.*, 65 F. Supp. 2d 164, 175 (S.D.N.Y. 1999).

### 3.   Plaintiffs Fail To Allege A Pattern of Racketeering Activity

A § 1962 claim must allege that the defendant engaged in a "pattern of racketeering activity."   *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232 (1989).   To do so, the complaint must allege that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* at 239.   "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects

---

[6]   Although the Confirmations were entered into by the limited liability company ("LLC") Plaintiffs, all Plaintiffs are bound by these representations.   The individual Plaintiffs -- who are the managing members of the LLCs and their spouses -- are bound because the Confirmations were entered into by the entities they formed for the very purpose of engaging in the Strategies.   *See, e.g.*, Compl. ¶¶ 92, 111 ("the Wolfson Plaintiffs, through RW Woodland Investments LLC and MP Woodland Investments LLC, entered into two *identical* private contracts with Deutsche Bank") (emphasis in original), 125, 128, 131, 152, 168. The other entity Plaintiffs are bound because they were formed by the individual Plaintiffs solely for purposes of the transactions, played a role in those transactions and directly benefited from the transactions.

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

1  into the future with a threat of repetition." *Id.* at 241.  Here, Plaintiffs do not allege

2  predicate acts with the requisite continuity.[7]

3            **a.**      **Plaintiffs Do Not Allege Closed-Ended Continuity**

4        A party may demonstrate closed-ended continuity "by proving a series

5  of related predicates extending over a substantial period of time." *H.J. Inc.*, 492

6  U.S. at 242.  Plaintiffs, however, merely allege limited conduct and, at most, allege

7  that Defendants collectively engaged in a single scheme to extract fees from

8  Plaintiffs for engaging in the Strategies.[8]  While allegations of a single scheme

9  may, in special circumstances, suffice to state a RICO claim, courts rarely find a

10  pattern where only one scheme is alleged.  *See, e.g., Durning v. Citibank, Int'l*, 990

11  F.2d 1133, 1138-39 (9th Cir. 1993) (plaintiffs failed to allege pattern where all

12  predicate acts arose from single, isolated event); *Schlaifer Nance & Co. v. Estate of*

13  *Andy Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) ("The acts complained of . . . are

14  subparts of the singular act, and not a 'pattern' of separate acts with an underlying

15  purpose.  Consequently, there is no closed-ended continuity.").  Because the

16  Complaint at most alleges a single scheme of limited duration, it does not allege

17  closed-ended continuity.[9]

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

---

18  [7]  As shown below, Plaintiffs do not allege with the requisite particularity even

19  one predicate act by the Deutsche Bank Defendants, much less a pattern.  *See*

20  *Tate v. PG&E Co.*, 230 F. Supp. 2d 1072, 1084-85 (N.D. Cal. 2002).

21  [8]  *See, e.g.*, Compl. ¶¶ 41, 223 ("On information and belief . . . Jenkens and the

22  Defendants conspired to devise and promote the Strategies for the purpose of

23  receiving and splitting millions of dollars in fees . . . .  The receipt of those fees

24  was the sole motive in the development and execution of the transaction."); *id.* ¶

25  53 ("Based on information and belief, Jenkens recruited the Defendants as

26  Marketing Participants to assist them in marketing the Strategies"); *id.* ¶ 224

27  ("The Defendants aggressively put their scheme into action.").

28  [9]  Defendants' alleged activity with respect to each Plaintiff group continued for

one year at most, with isolated, outlying predicate acts.  *See* Compl. ¶¶ 58, 64-

66, 69, 75, 89-90, 92-93, 98-99, 100-04, 107-08, 111, 115-19, 121-22, 125, 128,

131, 135-39, 144-45, 148, 152, 156-61, 165, 168, 172-78, 216, 218, 220-21.

This is insufficient to satisfy the continuity requirement.  *Religious Tech. Ctr. v.*

### b.    Plaintiffs Do Not Allege Open-Ended Continuity

Similarly, Plaintiffs have not pled open-ended continuity, which concerns the threat that alleged wrongful conduct will continue into the future and may be demonstrated by pleading "past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241-42. The Complaint is devoid of any specific allegations indicating open-ended continuity. None of the alleged predicate acts threatens to recur. As shown above, Plaintiffs essentially allege a single event in which Defendants entered into a scheme to obtain fees from Plaintiffs. Allegations of such isolated conduct do not demonstrate the threat of future repetition necessary to satisfy RICO's pattern requirement. *See, e.g., Durning*, 990 F.2d at 1139.

### 4.    Plaintiffs Do Not Allege A Cognizable RICO Enterprise Or The Deutsche Bank Defendants' Participation In Its Operation Or Management

To state a RICO claim under 18 U.S.C. § 1962(c), the Complaint must allege that the Deutsche Bank Defendants participated in the conduct of an enterprise through a pattern of racketeering activity. An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Plaintiffs attempt to plead two alternative association-in-fact enterprises: the "Solicitation Enterprise" and "FX Enterprise." Compl. ¶ 247. However, even an association-in-fact enterprise must have "an ongoing organization, formal or informal," with "the various associates [that] function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Thus, facts must be alleged establishing "an entity separate and apart from the pattern of

*Wallersheim*, 971 F.2d 364, 366-67 (9th Cir. 1992) ("We have found no case in which a court has held the [continuity] requirement to be satisfied by a pattern of activity lasting less than a year.").

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

1    activity in which it engages." *Turkette*, 452 U.S. at 583 ("[t]he 'enterprise' is not

2    the 'pattern of racketeering activity'; it is an entity separate and apart from the

3    pattern of activity in which it engages.  The existence of an enterprise at all times

4    remains a separate element which must be proved by the [plaintiff]."); *see also*

5    *Chang v. Chen*, 80 F.3d 1293, 1298-1299 (9th Cir. 1996) ("predicate acts of

6    racketeering activity, by themselves, do not satisfy the RICO enterprise element").

7    "At a minimum, to be an enterprise, an entity must exhibit 'some sort of structure .

8    . . for the making of decisions, whether it be hierarchical or consensual.'" *Chang*,

9    80 F.3d at 1299 (internal citation omitted).

10           Plaintiffs allege no racketeering enterprise separate and apart from the

11   alleged pattern of activity.  The Complaint lists the Defendants and other alleged

12   participants in the two enterprises, Compl. ¶ 247, but does not allege the structure

13   of the enterprises or the specific role that the Deutsche Bank Defendants (or any

14   other Defendants for that matter) are alleged to have played.  Nor are there any

15   allegations of any participation in the affairs of the enterprises separate and distinct

16   from the Deutsche Bank Defendants' alleged participation in the racketeering acts

17   themselves.  *See Chang*, 80 F.3d at 1299-1300 (finding appellants failed to plead

18   cognizable enterprise where they did not allege structure to organization beyond

19   alleged acts of racketeering activity).  In sum, while the Complaint attempts to set

20   forth various racketeering acts purportedly engaged in by the various Defendants,

21   Plaintiffs do not allege a cognizable RICO enterprise.

22           Furthermore, while the Complaint may contain some allegations

23   suggesting the Deutsche Bank Defendants provided services in connection with the

24   alleged enterprises, that alleged activity does not rise to the level of operation or

25   management of the enterprise.  *See Reves v. Ernst & Young*, 507 U.S. 170, 185

26   (1993); *Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993); *see also Dep't of*

27   *Econ. Dev. v. Arthur Andersen & Co.*, 924 F. Supp. 449, 468 (S.D.N.Y. 1996)

28   ("the provision of services – even essential services – to a RICO enterprise is not

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

1   the same as controlling an enterprise's affairs").   Similarly, Plaintiffs' allegations

2   that the Deutsche Bank Defendants had the ability to "control" whether a profit

3   was earned on the options transactions, *see, e.g.*, Compl. ¶¶ 37, 95, 97, 112, 114,

4   126, 129, 132, 134, 154-55, 169, 171, are insufficient to establish that the Deutsche

5   Bank Defendants participated in the operation or management of the alleged

6   enterprise.   As one court has explained, "it is not enough to control even fraudulent

7   activity that is ancillary to the fraud carried out by the RICO enterprise." *Dep't of*

8   *Econ. Dev.*, 924 F. Supp. at 467 (internal citation omitted).   Accordingly, because

9   the Complaint does not allege that the Deutsche Bank Defendants participated in

10  the operation or management of the alleged enterprise, Plaintiffs' § 1962(c) claim

11  must fail for this reason, as well.

### 5.   The § 1962(a) Claim Fails To Allege An Injury From The Investment Of Racketeering Income

14          The § 1962(a) claim alleges no injury by reason of use or investment

15  of racketeering income in an enterprise. *See Nugget Hydroelec., L.P. v. PG&E*

16  *Co.*, 981 F.2d 429, 437 (9th Cir. 1992).   A § 1962(a) claim must allege that

17  Plaintiffs "suffered injury arising from [Defendants'] investment or improper use

18  of racketeering income." *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073,

19  1083 (9th Cir. 2000).   Thus, injuries from § 1962(a) violations must be

20  differentiated from injuries caused by predicate acts.   *See Ouaknine v.*

21  *MacFarlane*, 897 F.2d 75, 83 (2d Cir. 1990) ("the essence of a violation of §

22  1962(a) is not commission of predicate acts but investment of racketeering

23  income").

24          Plaintiffs allege no injury caused by an investment in the alleged

25  enterprise that is distinct from any purported injury resulting from the predicate

26  acts.   None of the alleged bases of Plaintiffs' damages[10] relates to the Deutsche

---

[10] In attempting to set forth the purported injuries in connection with their claim
under § 1962(a), Plaintiffs state that "[a]s a proximate result of Defendants'

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

1  Bank Defendants' investment of racketeering income in an enterprise; at most,

2  they relate to injury from alleged predicate acts.[11] Thus, Plaintiffs' Section 1962(a)

3  claim must be dismissed.[12]

### 6.    The RICO Conspiracy Claim Must Be Dismissed Because Plaintiffs' Substantive RICO Claims Are Deficient

6          Because Plaintiffs cannot state a claim for a substantive violation of

7  RICO, their RICO conspiracy claim under 18 U.S.C. § 1962(d) must also be

8  dismissed.  *See, e.g., Howard*, 208 F.3d at 751 ("Plaintiffs cannot claim that a

9  conspiracy to violate RICO existed if they do not adequately plead a substantive

10  violation of RICO."); *Simon*, 208 F.3d at 1084 (failure to plead requisite elements

11  of § 1962(a) or 1962(c) violation "implicitly means [plaintiff] cannot plead a

12  conspiracy to violate either section").

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

---

unlawful pattern of illegal conduct as described above, Plaintiffs have been injured in their business or property *as described above*," Compl. ¶ 278 (emphasis added), and thus refer to the same alleged injuries stemming from the purported predicate acts of racketeering.

[11] Although Plaintiffs also allege that "Defendants' investment in the Enterprise harmed Plaintiffs as this investment directly allowed for the search for and marketing to Plaintiffs of the Strategies," Compl. ¶ 274, this allegation similarly fails to allege injury attributable to Defendants' alleged investment of racketeering income. *See Wagh v. Metris Direct, Inc.*, 363 F.3d 821, 829 (9th Cir. 2003) (affirming dismissal of 1962(a) claim where plaintiff alleged reinvestment of income and holding plaintiff must allege that funds derived from racketeering activity were used to injure him).

[12] Plaintiffs' conclusory allegation that "[t]he Defendants' acts amount to an overt and fraudulent scheme to deprive Plaintiffs of business or property rights, including money and other property to which Plaintiffs are entitled which Defendants have used to acquire an interest in and/or to establish the enterprise," Compl. ¶ 274, is also insufficient. *See Nugget*, 981 F.2d at 437-38 (plaintiff failed to state claim under § 1962(a) where allegations as to injury were "general, conclusory, and vague").

**7.     The RICO Aiding and Abetting Claim Must Be Dismissed**

A party may not be held liable under a federal statute for aiding and abetting a violation of that statute if the statute itself does not provide for liability based on aiding and abetting. *Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164, 181, 191 (1994) (no civil liability under § 10(b) of Securities Exchange Act for aiding and abetting because Act does not expressly provide for such liability). The RICO statute has no express provision for liability based on aiding and abetting. Therefore, Plaintiffs' claim for aiding and abetting is insufficient to establish RICO liability. *See Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644 (3d Cir. 1998), *abrogation on other grounds recognized*, *Forbes v. Eagleson*, 228 F.3d 471 (3d Cir. 2000). Even if civil aiding and abetting liability existed under RICO, however, this claim, which is premised on the §§ 1962(a) and 1962(c) claims, must fail because, as shown, those underlying claims are not viable. *See Westways World Travel v. AMR Corp.*, 182 F. Supp. 2d 952, 961 (C.D. Cal. 2001) (dismissing aiding and abetting claim premised on failed § 1962(a) claim).

**B.     The State Law Claims Must Be Dismissed[13]**

**1.     Plaintiffs Fail To State A Claim For Unjust Enrichment**

Plaintiffs claim that the Deutsche Bank Defendants were unjustly enriched by the fees received as part of the execution of the foreign exchange transactions. This claim must be dismissed. A claim for unjust enrichment "is an equitable remedy based on principles of quasi-contract. . . . [and] presupposes that there is not a valid contract between the parties." *MMT Sales Inc. v. Channel 53*

---

[13] New York law governs Plaintiffs' common law claims (*i.e.*, the claims other than the claim asserted under Cal. Bus. & Prof. Code § 17200) because the operative agreements (the "Account Agreements") and the agreements between Plaintiffs and Deutsche Bank confirming the terms of the investments (the Confirmations) contain New York choice of law clauses. *See* McLeod Decl. Exs. 2-20; 21-42.

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

*Inc.*, No. 92 Civ. 7207 (SS), 1993 WL 541242, at *4 (S.D.N.Y. Dec. 27, 1993) (applying New York law. Accordingly, "Under New York law, '[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.'" *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 610 (2d Cir. 1996) (internal citation omitted); *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 312 (S.D.N.Y. 1998). Here, the Deutsche Bank Defendants' fees (*i.e.*, premium) were provided for in the FX Contracts that Plaintiffs executed. As a result, these fees cannot be recovered on an unjust enrichment theory.

Plaintiffs attempt to avoid this limitation on unjust enrichment claims by asserting that their FX Contracts with the Deutsche Bank Defendants fail for a lack of consideration because the contracts vested the Deutsche Bank Defendants with discretion to select a spot rate. *See* Compl. ¶ 314. However, an agreement that grants a party discretion is still enforceable. New York law addresses discretion conferred in a contract by imposing an obligation of good faith, not by deeming the contract illusory and unenforceable for lack of consideration.[14] *See Paper Corp. of United States v. Schoeller Technical Papers, Inc.*, 807 F. Supp. 337, 346 (S.D.N.Y. 1992). Therefore, Plaintiffs' claim for a declaration that the FX Contracts are unenforceable should be denied, and their unjust enrichment claim must fail.

**2.      Plaintiffs Fail To State A Claim For Breach Of Contract Or Breach Of The Duty Of Good Faith And Fair Dealing**

To state a breach of contract claim, a plaintiff must allege the provision of the contract that was purportedly breached. *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d. 490, 494 (S.D.N.Y. 2002) (applying New York law).

---

[14] As discussed below, there is no allegation that the Deutsche Bank Defendants did not act in good faith in exercising their discretion.

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

Plaintiffs point to no provision of their agreements that the Deutsche Bank Defendants allegedly breached and thus appear to state a claim based upon an alleged breach of the implied covenant of good faith and fair dealing. That covenant prohibits a party from engaging in conduct that "will have the effect of destroying or injuring the rights of the other party to receive the benefits of the contract." *Agency Dev., Inc. v. Medamerica Ins. Co. of New York*, No. 02-CV-6663L, 2004 WL 1570259, at *2 (W.D.N.Y. June 17, 2004) (applying New York law).

Plaintiffs' claim is based in part on the Deutsche Bank Defendants' purported failure to disclose the extent of their discretion to choose the spot rates. *See* Compl. ¶ 319. In fact, this discretion is explicitly disclosed in the contracts themselves, McLeod Decl. Exs. 21-42 ("a particular spot rate shall be disregarded if [Deutsche Bank], acting in good faith considers that it would not be commercially reasonable to take account of it"), and "a party that has acted in compliance with the rights expressly provided in the governing contract cannot be held liable for breaching an implied covenant of good faith." *Sterbenz v. Attina*, 205 F. Supp. 2d 65, 70 (S.D.N.Y. 2002); *Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d 555, 558 (N.Y. App. Div. 1996) (no breach of covenant of good faith and fair dealing because contract gave defendants "complete discretion," and thus defendants "did not act in bad faith by exercising [that discretion]"). Moreover, in situations such as this, "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2d Cir. 2004) (internal citation omitted) (applying New York law). Plaintiffs do not allege that the Deutsche Bank Defendants acted arbitrarily or irrationally in selecting the spot rates or that some alternative spot rate should have been chosen.

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

Plaintiffs also base their claim for breach of the duty of good faith and fair dealing on allegations that the Deutsche Bank Defendants failed to disclose certain information and gave improper tax advice in connection with the Strategies. Compl. ¶ 319.  However, Plaintiffs have failed to allege any facts demonstrating that the Deutsche Bank Defendants deprived them of any rights they had under their agreements. *See Jaffe v. Paramount Communs. Inc.*, 644 N.Y.S.2d 43, 47-48 (N.Y. App. Div. 1996) (affirming dismissal of claim for breach of covenant of good faith and fair dealing where plaintiff failed to allege any facts demonstrating that defendants deprived him of any rights he possessed under their agreement); *see also Sutton Assocs. v. Lexis-Nexis*, 761 N.Y.S.2d 800, 804 (N.Y. Sup. Ct. 2003) (dismissing claim for breach of duty of good faith and fair dealing where complaint failed to identify any specific contractual provision actually breached and claim was duplicative of failed claim for fraud).

### 3. Plaintiffs Fail To State A Claim For Breach Of Fiduciary Duty

The breach of fiduciary duty claim fails because Plaintiffs and the Deutsche Bank Defendants did not have a fiduciary relationship. *See Laikin v. Vaid*, Index No. 604996/00, 2001 WL 1682873, at *1 (N.Y. Sup. Ct. Oct. 10, 2001) (fiduciary relationship essential to breach of fiduciary duty claim); *Compania Sud-Americana de Vapores S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 427 (S.D.N.Y. 1992) (same) (applying New York law).  Under New York law, a fiduciary relationship is one where "trust or confidence [is] reposed by one person in the integrity and fidelity of another." *Compania*, 785 F. Supp. at 425 (citation omitted).  New York courts are loath to find fiduciary relationships where, as here, parties "deal at arms-length in a commercial transaction," and instead will only find such a duty in "extraordinary circumstances." *Id.* at 426.

Plaintiffs allege no such extraordinary circumstances, but merely assert that "Defendants, as the Plaintiffs' accountants and advisors, were Plaintiffs'

-17-

fiduciaries." Compl. ¶ 323. However, Plaintiffs explicitly acknowledged to the Deutsche Bank Defendants that no fiduciary relationship existed. Specifically, the Confirmations evidencing the terms of the transactions entered into by Plaintiffs state that the Deutsche Bank Defendants were "not acting as a fiduciary for or advisor to [Plaintiffs] in respect of this Transaction." McLeod Decl. Exs. 21-42. "Because contractual disclaimers of fiduciary duty are effective in New York, no fiduciary duty can arise from the relationship between [Plaintiffs] and Deutsche Bank." *Seippel*, 2004 WL 1907315, at *12 (construing FX contracts entered into by plaintiffs and Deutsche Bank that contained disclaimers identical to those contained in the contracts Plaintiffs signed here).[15]

Plaintiffs cannot transform their arms-length, contractual relationship with the Deutsche Bank Defendants into a fiduciary one by arguing that the Deutsche Bank Defendants had discretion to select spot rates under the FX Contracts. *See Compania*, 785 F. Supp. at 427 (no fiduciary relationship in case involving foreign exchange contracts where investment bank chose "spot rate" and then executed transactions on customer's behalf); *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 353 (2d Cir. 1992) (bank engaged in extensive currency transactions with debtor owed debtor no fiduciary duty "[b]y virtue of their exchange agreements [because the parties] stood in an ordinary, arms-length commercial relationship [and] [p]urely commercial transactions do not give rise to a fiduciary relationship"); *Swartz*, slip op., at 17 (McLeod Decl. Ex. 43) (dismissing breach of fiduciary duty claim where there was "[no] conceivable set

---

[15] Plaintiffs unsuccessfully attempt to fashion a fiduciary duty by alleging a relationship of trust and confidence. Compl. ¶ 338(1). Such trust and confidence, however, must be accepted by the other party and must be reposed *justifiably*. *Breindel & Ferstendig v. Willis Faber & Dumas Ltd.*, No. 95 Civ. 7905, 1996 WL 413727, at *6 (S.D.N.Y. July 24, 1996). Any such trust and confidence here was unjustified given the explicit statements to the contrary in the Confirmations (McLeod Decl. Exs. 21-42), as discussed above and in the following section.

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

of facts which plaintiff could plead that would establish the possibility that a multimillionaire . . . could find himself in an unequal bargaining position with a tax advisor").

**4.      Plaintiffs Fail To State A Claim For Fraud**

Under New York law, to state a claim for fraud a plaintiff must allege (1) a misrepresentation or omission of a material fact, (2) the defendant's intent to deceive, (3) justifiable reliance, and (4) injury caused to the plaintiff by the defendant's misrepresentation or omission. *See Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 898 (N.Y. 1999); *Rich v. Maidstone Fin., Inc.*, No. 98 CIV. 2569, 2001 WL 286757, at *11 (S.D.N.Y. Mar. 23, 2001). Even if the Complaint alleged with the requisite particularity a material misrepresentation or omission by the Deutsche Bank Defendants – which, as shown below, it does not – any alleged reliance by Plaintiffs would have been unreasonable as a matter of law in light of the representations Plaintiffs made in the Confirmations:

> [They are] acting for [their] own account, and [they have] made [their] own independent decisions to enter into [the] Transaction and as to whether the Transaction is appropriate or proper for [them] based upon [their] own judgment and upon advice from such advisers as [they] deemed necessary.   [They are] not relying on any communication (written or oral) of [Deutsche Bank] including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into [the] Transaction, it being understood that information and explanations related to the terms and conditions of [the] Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction.  No communication (written or oral) received from [Deutsche Bank] shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

McLeod Decl. Exs. 21-42.  In light of these affirmative representations, Plaintiffs cannot establish justifiable reliance as matter of law.  *See, e.g., Swartz*, slip op. at 8 (alleged oral misrepresentations could not "establish reasonable reliance as a matter of law where there are written documents which contradict any oral statements"); *Ross v. CCS Int'l Ltd.*, No. 98 CV 4090 (RO), 2000 WL 1804103, at *4 (S.D.N.Y Dec. 8, 2000) (dismissing fraud counterclaim because "[d]efendants' reliance on [plaintiff's] representations in the face of clearly contradictory language in the [parties' agreement] is unreasonable"); *but see Seippel*, 2004 WL 1907315, at *10.

### 5.   Plaintiffs State No Claim For Civil Conspiracy

There is no substantive tort of civil conspiracy under New York law. Rather, to state a claim involving an alleged civil conspiracy, a complaint must allege an independent actionable tort and four additional elements: (1) a corrupt agreement; (2) an overt act in furtherance of the agreement; (3) a party's intentional participation in the furtherance of a plan; and (4) resulting damage. *Lewis v. Rosenfeld*, 138 F. Supp. 2d 466, 479 (S.D.N.Y. 2001).   Even if the Complaint alleged these four elements -- which it does not -- for the reasons set forth above, Plaintiffs have not alleged a viable independent tort.  Accordingly, this claim must be dismissed.  *I.L.G.W.U. v. Nat'l Ret. Fund v. Cuddlecoat, Inc.*, No. 01 Civ. 4019, 2004 WL 444071, at *3 (S.D.N.Y. Mar. 11, 2004) (dismissing civil conspiracy claims for failure to plead an actionable tort).

### 6.   Plaintiffs State No Claim Under The California Unfair Competition Law

Plaintiffs do not indicate under which prong of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 their claim arises, but instead conclusorily allege violations of the UCL based on the Deutsche Bank Defendants' "unlawful, unfair or fraudulent" practices.  Compl. ¶¶ 364-65.  As

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

discussed below, Plaintiffs fail to adequately allege that the Deutsche Bank Defendants engaged in either unlawful, unfair, or fraudulent practices.

To the extent Plaintiffs' UCL claim is premised on violations of other substantive law, it must be dismissed because the claims constituting the foundation of the violation must be dismissed. Dismissal under the "unlawful" prong of the UCL is warranted when no underlying claim can be stated. *Bush v. Loanstar Mortgagee Services, L.L.C.*, 286 F. Supp. 2d 1210, 1216 (N.D. Cal. 2003) (because plaintiffs failed to state a claim for violation of the Fair Debt Collection Practices Act, plaintiffs also failed to state a claim that conduct was "unlawful" under § 17200); *see also Renick v. Dun & Bradstreet Receivable Mgt. Servs.*, 290 F.3d 1055, 1057-1058 (9th Cir. 2002).

To succeed under the "fraudulent practices" prong of the UCL, a plaintiff must allege practices "that are likely to deceive the public." *Qarbon.com Inc. v. eHelp Corp.*, 315 F. Supp. 2d 1046, 1051 (N.D. Cal. 2004). Plaintiffs allege no facts demonstrating that the provision of services by the Deutsche Bank Defendants, who allegedly assisted wealthy individuals to engage in tax-advantaged strategies, Compl. ¶ 57, pose such a threat to *the public at large*. *See* Compl. ¶¶ 364-66. *Aquino v. Credit Control Servs.*, 4 F. Supp. 2d 927, 930 (N.D. Cal. 1998) (dismissing § 17200 claim where plaintiff failed to support allegations that defendant's actions harmed or misled public with any facts other than her particularized problems); *Swartz*, slip op. at 11 (dismissing analogous claim under Washington Consumer Protection Act).

The Complaint also fails to allege facts that would support a claim that the Deutsche Bank Defendants' behavior was "unfair." To be "unfair" for purposes of the UCL, behavior must threaten an incipient violation of law or violate the policy or spirit of the law. *See Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999) (adopting definition of "unfair" under § 17200 in context of antitrust violations); *see also Scripps Clinic v.*

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

-21-

*Superior Court*, 108 Cal. App. 4th 917, 940 (2003) (agreeing that *Cel-Tech* narrowed expansive earlier interpretations of "unfair"). Here, Plaintiffs identify no law that the Deutsche Bank Defendants' conduct allegedly violated. Accordingly, the Court should not allow bald assertions of "unfairness" to form the nucleus of a UCL claim. *See Aquino*, 4 F. Supp. 2d at 930.

### 7.  Plaintiffs Are Not Entitled To Declaratory Judgment

As Plaintiffs' substantive claims are all deficient, they are not entitled to a declaration that "Defendants are liable to Plaintiffs for such penalties, interest, loss of certain other deductions, costs, professional fees, expenses and damages." Compl. ¶ 355. *See In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993) (court may only enter a declaratory judgment in favor of a party who had a substantive claim of right to such relief); *Swartz*, slip op. at 13 (dismissing with prejudice declaratory judgment cause of action where substantive causes of action dismissed); *Union Station Assocs. LLC v. Puget Sound Energy, Inc.*, 238 F. Supp. 2d 1226, 1230-31 (W.D. Wash. 2002).

## II.  THE FRAUD-BASED CLAIMS DO NOT SATISFY RULE 9(b)

Plaintiffs' RICO, fraud and breach of fiduciary duty claims are all premised upon alleged fraudulent conduct. As such, these claims are subject to the heightened pleading requirements of Rule 9(b).[16] To satisfy these more rigorous pleading requirements, a complaint must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Moore*, 885 F.2d at 541. Where multiple defendants are charged with fraudulent conduct, Rule 9(b) requires that the complaint inform each

---

[16] Rule 9(b) applies to both RICO claims and state law claims premised on fraud. *See, e.g., Moore v. Kayport Pkg. Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989) (applying Rule 9(b) to RICO allegations premised on mail fraud); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) ("It is established law . . . that Rule 9(b)'s particularity requirement applies to state-law causes of action.").

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

1    defendant of its alleged participation in the fraud and not simply attribute

2    fraudulent conduct to "defendants" generally. *Id.*

3            The Complaint is replete with conclusory allegations regarding

4    purported acts of mail and wire fraud[17] and other allegedly fraudulent conduct[18]

5    purportedly engaged in by Defendants collectively.  Where the Complaint does

6    attribute a specific statement to the Deutsche Bank Defendants, there is no

7    allegation of how the statement is allegedly false or misleading, nor are there

8    legally sufficient allegations of the circumstances surrounding the statements.  In

9    short, with respect to the Deutsche Bank Defendants, Plaintiffs have not adequately

10   articulated the "who, what, when, where, how" associated with the fraudulent

11   conduct they allege.  *See Vess*, 317 F.3d at 1106.  Moreover, to the extent

12   Plaintiffs' fraud-based claims are premised upon alleged omissions, Plaintiffs fail

13   to specify the person responsible for the failure to speak, the precise context of the

14   omission and the manner in which it misled Plaintiffs.[19]  *See Hokama v. E.F.*

---

[17] Plaintiffs do not allege with specificity even one predicate act by the Deutsche Bank Defendants, let alone multiple acts constituting continuity plus relationship.  The mail and wire fraud allegations identify no speaker or the time or place of the alleged uses of the mail or wires.  Allegations as to the nature of the fraud are similarly general. *See* Compl. ¶¶ 260-65.

[18] The fraud claim rests upon allegations that Defendants, collectively, "made numerous knowingly false affirmative representations and intentional omissions of material facts to Plaintiffs" (Compl. ¶ 329), but the Complaint contains only vague, general allegations. *See, e.g., id.* ¶¶ 40-42, 46, 52, 57-60, 62-63, 67-68, 70-71, 73, 76-78, 87, 114, 134, 155, 171, 183-87, 212-15, 218.  Similarly, the breach of fiduciary duty claim (which is based upon alleged fraudulent conduct) merely alleges conduct by Defendants collectively without identifying any speaker, time, place, or contents of any alleged misrepresentation or fraudulent statement. *See id.* ¶ 325.

[19] While the Complaint alleges that Defendants collectively "omitted to state material facts which made statements misleading" (¶ 40), did not tell Plaintiffs certain information about the FX Contracts (¶ 97, 114, 134, 155, 171), and did not inform Plaintiffs of certain IRS Notices (¶¶ 187, 213), Plaintiffs fail to specify any person associated with Deutsche Bank responsible for the purported

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

-23-

*Hutton & Co.*, 566 F. Supp. 636, 646 (C.D. Cal. 1983) (complaint must specify alleged source of omissions claimed).

Accordingly, the RICO, fraud, and breach of fiduciary duty claims against the Deutsche Bank Defendants should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the Deutsche Bank Defendants respectfully request that this Court dismiss with prejudice the claims asserted against them.

Dated: February 4, 2005

Respectfully submitted,

DEWEY BALLANTINE LLP

By: _David S. McLeod_

David S. McLeod

333 South Grand Avenue
Los Angeles, California  90071-1530
Telephone:  (213) 621-6000
Facsimile:  (213) 621-6100

*Attorneys for Defendants Deutsche
Bank AG, Deutsche Bank Securities
Inc., d/b/a Deutsche Bank Alex.
Brown, Craig Brubaker, Phillip
Miles, and Paul Young*

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

---

failure to speak, the precise context of the omission and the manner in which it misled Plaintiffs.

**DEWEY BALLANTINE LLP**
333 South Grand Avenue
Los Angeles, California 90071-1530

## DECLARATION OF DAVID S. McLEOD

I, David S. McLeod, declare as follows:

1.      I am an attorney licensed to practice law in the State of California and am a partner at Dewey Ballantine LLP, counsel for Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., d/b/a Deutsche Bank Alex. Brown, Craig Brubaker, Phillip Miles and Paul Young (the "Deutsche Bank Defendants") in this action.  I make this declaration in support of the Deutsche Bank Defendants' Motion to Dismiss.  I have personal knowledge of the following facts, and if called upon to do so, could and would testify completely thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the plaintiffs' First Amended Complaint.

3.      Attached hereto as Exhibit 2 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for the Barron Family Trust, Robert L. Barron and Xin M. Barron executed by Robert Barron on January 3, 2001.

4.      Attached hereto as Exhibit 3 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for the Barron Family Trust executed by Robert Barron and Xin Barron on October 6, 2001.

5.      Attached hereto as Exhibit 4 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for the Barron Family Trust executed by John Flanagan (as Attorney-In-Fact for Robert L. Barron) and Xin Barron on December 29, 2000 and January 4, 2001 respectively.

6.      Attached hereto as Exhibit 5 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for KMEK Investment Partners executed by Kurt Daviscourt on October 27, 2000.

7.      Attached hereto as Exhibit 6 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for Ed Panther Investments, LLC executed by Eric Daviscourt on October 30, 2000.

8.         Attached hereto as Exhibit 7 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for Ed Panther Investors, Inc. executed by Ed Daviscourt on October 27, 2000.

9.         Attached hereto as Exhibit 8 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for KD1 Investments LLC executed by Kurt Daviscourt on October 27, 2000.

10.       Attached hereto as Exhibit 9 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for KD2 Investments LLC executed by Kimberly Daviscourt on October 27, 2000.

11.       Attached hereto as Exhibit 10 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for KD1 Investors, Inc. executed by Kurt Daviscourt on October 27, 2000.

12.       Attached hereto as Exhibit 11 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for MD Kenmore Investments, LLC executed by Mark Daviscourt on October 27, 2000.

13.       Attached hereto as Exhibit 12 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for MD Kenmore Investors, Inc. executed by Mark Daviscourt on October 27, 2000.

14.       Attached hereto as Exhibit 13 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for JD Kenmore Investments, LLC executed by Julie Daviscourt on October 27, 2000.

15.       Attached hereto as Exhibit 14 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for Woodland Investors, Inc. executed by Robert Wolfson on March 27, 2000.

16.       Attached hereto as Exhibit 15 is a true and correct copy of another Deutsche Bank Alex. Brown Account Agreement for Woodland Investors, Inc. executed by Robert Wolfson on March 27, 2000.

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

17.     Attached hereto as Exhibit 16 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for RW Woodland Investments LLC executed by Robert Wolfson on March 27, 2000.

18.     Attached hereto as Exhibit 17 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for MP Woodland Investments LLC executed by Marilyn Pugatch on March 27, 2000.

19.     Attached hereto as Exhibit 18 is a true and correct copy of a Deutsche Bank Alex. Brown Account Agreement for Frontier Investment Partners executed by Jeffrey L. Johnson on September 13, 2000.

20.     Attached hereto as Exhibit 19 is a true and correct copy of a Deutsche Bank Alex. Brown Partnership Account Authorization Indemnity executed by Mark Davis and Jeffrey Johnson on November 1, 1999.

21.     Attached hereto as Exhibit 20 is a true and correct copy of a Deutsche Bank Alex. Brown Partnership Account Authorization Indemnity executed by Mark Davis and Jeffrey Johnson on September 13, 2000.

22.     Attached hereto as Exhibit 21 is a true and correct copy of a Letter Agreement (Confirmation) between Deutsche Bank AG and JJ Preserve Parkway LLC executed by Jeffrey L. Johnson on or about November 22, 1999.

23.     Attached hereto as Exhibit 22 is a true and correct copy of a Letter Agreement (Confirmation) between Deutsche Bank AG and MD Duke Enterprise LLC executed by Mark W. Davis on or about November 22, 1999.

24.     Attached hereto as Exhibit 23 is a true and correct copy of a Letter Agreement (Confirmation) between Deutsche Bank AG and MD Duke Enterprise LLC executed by Mark W. Davis on or about October 31, 2000.

25.     Attached hereto as Exhibit 24 is a true and correct copy of another Letter Agreement (Confirmation) between Deutsche Bank AG and MD Duke Enterprise LLC executed by Mark W. Davis on or about October 31, 2000.

26.     Attached hereto as Exhibit 25 is a true and correct copy

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

-3-

1  2000.

2        35.          Attached hereto as Exhibit 34 is a true and correct copy

3  of a Letter Agreement (Confirmation) between Deutsche Bank AG and KD1

4  Investments LLC executed by Kurt Daviscourt on or about November 10, 2000.

5        36.          Attached hereto as Exhibit 35 is a true and correct copy

6  of a Letter Agreement (Confirmation) between Deutsche Bank AG and ED Panther

7  Investments LLC executed by Eric Daviscourt on or about November 10, 2000.

8        37.          Attached hereto as Exhibit 36 is a true and correct copy

9  of a Letter Agreement (Confirmation) between Deutsche Bank AG and MD

10  Kenmore Investments LLC executed by Mark Daviscourt on or about November

11  10, 2000.

12        38.          Attached hereto as Exhibit 37 is a true and correct copy

13  of a Letter Agreement (Confirmation) between Deutsche Bank AG and JD

14  Kenmore Investments LLC executed by Julie Daviscourt on or about November

15  10, 2000.

16        39.          Attached hereto as Exhibit 38 is a true and correct copy

17  of another Letter Agreement (Confirmation) between Deutsche Bank AG and JD

18  Kenmore Investments LLC executed by Julie Daviscourt on or about November

19  10, 2000.

20        40.          Attached hereto as Exhibit 39 is a true and correct copy

21  of another Letter Agreement (Confirmation) between Deutsche Bank AG and MD

22  Kenmore Investments LLC executed by Mark Daviscourt on or about November

23  10, 2000.

24        41.          Attached hereto as Exhibit 40 is a true and correct copy

25  of another Letter Agreement (Confirmation) between Deutsche Bank AG and ED

26  Panther Investments LLC executed by Eric Daviscourt on or about November 10,

27  2000.

28        42.          Attached hereto as Exhibit 41 is a true and correct copy

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530

1  of a Letter Agreement (Confirmation) between Deutsche Bank AG and RLB Jen

2  Court Investments LLC executed by Robert L. Barron on or about July 24, 2001.

3        43.      Attached hereto as Exhibit 42 is a true and correct copy

4  of another Letter Agreement (Confirmation) between Deutsche Bank AG and RLB

5  Jen Court Investments LLC executed by Robert L. Barron on or about July 24,

6  2001.

7        44.      Attached hereto as Exhibit 43 is a true and correct copy

8  of *Swartz v. KPMG LLC, et al.*, No. C03-1252P (W.D. Wash. Feb. 13, 2004).

9

10        I declare under penalty of perjury under the laws of the United States

11  of America that the foregoing is true and correct.  Executed in Los Angeles, this

12  4th day of February, 2005.

13

14                    David S. McLeod

15

DEWEY BALLANTINE LLP
333 South Grand Avenue
Los Angeles, California 90071-1530




ORIGINAL

1   JOBETH HALPER (State Bar # 167729)
2   JOBETH HALPER LITIGATION GROUP
3   400 South Sierra Avenue, Suite 100
4   Solana Beach, California 92075
5   Telephone:  (858) 755-0845
6   Facsimile: (858) 755-0851
7
8   DAVID R. DEARY, ESQ.
9   W. RALPH CANADA, JR., ESQ.
10  STEWART CLANCY, ESQ.
11  JEVEN R. SLOAN, ESQ.
12  SHORE ★ DEARY, L.L.P.
13  2515 McKinney Avenue, Suite 1565
14  Dallas, Texas 75201
15  Telephone:  (214) 360-9622
16  Facsimile:  (214) 739-3879
17



18              IN THE UNITED STATES DISTRICT COURT
19           FOR THE CENTRAL DISTRICT OF CALIFORNIA
20                      WESTERN DIVISION
21
22  **ROBERT L. BARRON,**                    §
23  **XIN BARRON, BARRON FAMILY**            §
24  **TRUST, JEN TRUST PARTNERS,**           §
25  **RLB JEN INVESTORS, INC.,**             §
26  **RLB JEN COURT INVESTMENTS,**           §
27  **LLC, RLB JEN COURT PARTNERS,**         § NO. SACV04-0401 AHS (ANx)
28  **ROBERT WOLFSON, MARILYN**              §
29  **M. PUGATCH, WOODLAND**                 §
30  **INVESTMENT PARTNERSHIP,**              §
31  **RW WOODLAND INVESTMENTS**              §
32  **LLC, MP WOODLAND**                     §
33  **INVESTMENTS LLC, WOODLAND**            §
34  **INVESTORS, INC., JEFFREY L.**          §
35  **JOHNSON, MARK W. DAVIS,**              §
36  **MD DUKE ENTERPRISES LLC,**             §
37  **JJ PRESERVE PARKWAY LLC,**             §
38  **FRONTIER INVESTMENT PARTNERS,**§
39  **HORIZON INVESTMENT PARTNERS,**         §
40  **JM DELTA TRADING COMPANY,**            §

PLAINTIFFS' FIRST AMENDED COMPLAINT                  Page 1

EXHIBIT ____1____
PAGE ____30____



1   KURT DAVISCOURT, KIMBERLY          §
2   DAVISCOURT, MARK DAVISCOURT,      §
3   JULIE DAVISCOURT, ERIC            §
4   DAVISCOURT, PAMELA               §
5   DAVISCOURT, KMEK INVESTMENT        §
6   PARTNERS, ED PANTHER             §
7   INVESTMENTS, LLC, ED PANTHER       §
8   INVESTORS, INC., KD1             §
9   INVESTMENTS LLC, KD2             §
10  INVESTMENTS LLC, KD1             §
11  INVESTORS, INC., MD KENMORE        §
12  INVESTMENTS, LLC, MD KENMORE       §
13  INVESTORS, INC., and JD KENMORE    §
14  INVESTMENTS, LLC,                §
15                                   §
16  PLAINTIFFS,                      §       PLAINTIFFS' FIRST
17                                   §       AMENDED COMPLAINT
18  v.                              §
19                                   §
20  DEUTSCHE BANK AG,               §
21  DEUTSCHE BANK SECURITIES,         §
22  INC., D/B/A DEUTSCHE BANK ALEX    §
23  BROWN, a DIVISION of DEUTSCHE     §
24  BANK SECURITIES, INC.,           §
25  CRAIG BRUBAKER,                  §
26  PHILLIP MILES, PAUL YOUNG,         §       JURY TRIAL DEMANDED
27  AMERICAN EXPRESS COMPANY,         §
28  AMERICAN EXPRESS TAX             §
29  AND BUSINESS SERVICES, INC., and   §
30  ROBERT GOLDSTEIN,               §
31                                   §
32  DEFENDANTS.                     §
33
34

PLAINTIFFS' FIRST AMENDED COMPLAINT                     Page 2

EXHIBIT   1
PAGE      31

## PLAINTIFFS' FIRST AMENDED COMPLAINT

1

2       Plaintiffs Robert L. Barron and Xin Barron, the Barron Family Trust, Jen

3   Trust Partners, RLB Jen Investors, Inc., RLB Jen Court Investments LLC, RLB Jen

4   Court Partners, Robert Wolfson and Marilyn M. Pugatch, Woodland Investment

5   Partnership, RW Woodland Investments LLC, MP Woodland Investments LLC,

6   Woodland Investors, Inc., Jeffrey L. Johnson, Mark W. Davis, MD Duke

7   Enterprises LLC, JJ Preserve Parkway LLC, Frontier Investment Partners, Horizon

8   Investment Partners, JM Delta Trading Company, Kurt Daviscourt, Kimberly

9   Daviscourt, Mark Daviscourt, Julie Daviscourt, Eric Daviscourt, Pamela

10  Daviscourt, KMEK Investment Partners, Ed Panther Investments LLC, Ed Panther

11  Investors, Inc., KD1 Investments LLC, KD2 Investments LLC, KD1 Investors,

12  Inc., MD Kenmore Investments, LLC, MD Kenmore Investors, Inc., and JD

13  Kenmore Investments, LLC (hereinafter sometimes collectively referred to as the

14  "Plaintiffs") bring this action against Defendants Deutsche Bank AG, Deutsche

15  Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown, a division of Deutsche

16  Bank Securities, Inc., Craig Brubaker, Phillip Miles, Paul Young, American

17  Express Company, American Express Tax & Business Services, Inc., and Robert

18  Goldstein, (all defendants are sometimes collectively referred to as the

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 3

EXHIBIT ___1___

PAGE ___32___

1   "Defendants"), seeking damages for claims arising out of tax strategies of the type

2   further described herein, and state:

3                             **I.**

4                 **JURISDICTION AND VENUE**

5       1.    This is an action arising under RICO, as well as for breach of

6   fiduciary duty, fraud, breach of contract, breach of the duty of good faith and fair

7   dealing, negligent misrepresentation, professional malpractice, declaratory

8   judgment and unjust enrichment, unethical, excessive and illegal fees, unfair

9   practices and civil conspiracy. This Court has jurisdiction of this action under 28

10   U.S.C. § 1331 (federal question jurisdiction), as well as this Court's pendent and/or

11   supplemental jurisdiction.

12       2.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) or 18

13   U.S.C. § 1965(a) (RICO venue). One or more of the Defendants resides, may be

14   found, has an agent or transacts his or its affairs in this District.

15       3.    This Court has personal jurisdiction over each of the Defendants.

16   Each of the Defendants either has its principal place of business in the State of

17   California, has committed a tort in whole or in part in California, or has otherwise

18   done business in California. Alternatively, to serve the ends of justice, this Court

19   has personal jurisdiction over each Defendant pursuant to 18 U.S.C. § 1965(b)

PLAINTIFFS' FIRST AMENDED COMPLAINT          Page 4

EXHIBIT____1___

PAGE____33___

1    because one or more Defendants resides, may be found, has an agent, or transacts

2    its affairs in this District.

3         4.    In connection with the wrongs complained of herein, Defendants

4    directly or indirectly, used the means and instruments of interstate commerce,

5    including the United States mails and interstate telephone communications.

6                            **II.**

7                       **PARTIES**

8         5.    Plaintiffs Robert L. Barron and Xin Barron (the "Barron Plaintiffs")

9    and Robert Wolfson and Marilyn M. Pugatch (the "Wolfson Plaintiffs") are

10    individuals and citizens of California.

11         6.    Plaintiffs Jeffrey L. Johnson and Mark W. Davis (the "Johnson

12    Plaintiffs") are individuals.  Jeff Johnson is a citizen of Colorado and Mark Davis

13    was a citizen of Colorado at the time of the transaction at issue, but is now a citizen

14    of Michigan.

15         7.    Plaintiffs Eric and Pamela Daviscourt, Kurt and Kimberly Daviscourt,

16    and Mark and Julie Daviscourt (the "Daviscourt Plaintiffs") are individuals (the

17    Daviscourt Plaintiffs, the Johnson Plaintiffs, the Barron Plaintiffs and the Wolfson

18    Plaintiffs are sometimes collectively referred to herein as the "Individual

19    Plaintiffs").

PLAINTIFFS' FIRST AMENDED COMPLAINT            Page 5

EXHIBIT 1
PAGE 34

1      8.     Eric and Pamela Daviscourt are citizens of Texas.

2      9.     Kurt and Kimberly Daviscourt and Mark and Julie Daviscourt are

3  citizens of Washington.

4      10.    Plaintiff Barron Family Trust is a trust formed under the laws of the

5  state of California.

6      11.    Plaintiffs RLB Jen Court Investments LLC, RW Woodland

7  Investments LLC, MP Woodland Investments LLC, MD Duke Enterprises LLC, JJ

8  Preserve Parkway LLC, Ed Panther Investments LLC, KD1 Investments LLC,

9  KD2 Investments LLC, MD Kenmore Investments, LLC, and JD Kenmore

10  Investments, LLC are single member limited liability companies formed under the

11  laws of the State of Delaware.

12     12.    Plaintiffs Jen Trust Partners, RLB Jen Court Partners, and Woodland

13  Investment Partnership are California general partnerships organized and existing

14  in conformity with the laws of California.

15     13.    Plaintiffs Frontier Investment Partners and Horizon Investment

16  Partners are Colorado general partnerships organized and existing in conformity

17  with the laws of Colorado.

18     14.    Plaintiff KMEK Investment Partners is a Washington general

19  partnership organized and existing in conformity with the laws of Washington.

PLAINTIFFS' FIRST AMENDED COMPLAINT          Page 6

EXHIBIT ___1
PAGE _35_

1       15.    Plaintiffs RLB Jen Investors, Inc., Woodland Investors, Inc., JM Delta

2    Trading Company, KD1 Investors, Inc., MD Kenmore Investors, Inc., Ed Panther

3    Investors, Inc. are each an "S corporation" formed under the laws of the State of

4    Delaware.

5       16.    Defendant Deutsche Bank AG ("Deutsche Bank") is a German

6    corporation with its principal place of business at Taunusanlage 12, 60325

7    Frankfurt am Main, Germany.

8    Deutsche Bank is continuously and systematically engaged in business in the State

9    of California, as further described herein, and thus may be found in the State of

10    California, and has agents doing business in the State of California.

11       17.    Defendant Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex

12    Brown ("DB Alex Brown"), is a Delaware corporation with its principal place of

13    business at 31 West 52nd Street, New York, New York, 10019.  Deutsche Bank

14    Securities, Inc. is a member of the New York Stock Exchange. DB Alex Brown is

15    continuously and systematically engaged in business in the State of California, as

16    further described herein, and thus may be found in the State of California, and has

17    agents doing business in the State of California. DB Alex Brown is licensed to do

18    business in the State of California.

PLAINTIFFS' FIRST AMENDED COMPLAINT          Page 7

EXHIBIT ___1___
PAGE ___36___

1      18.  Defendant Craig Brubaker is an individual and resident of Texas.

2  This Defendant is an employee of Deutsche Bank and/or DB Alex Brown.  This

3  Defendant is continuously and systematically engaged in business in the State of

4  California, as further described herein, and thus may be found in the State of

5  California, and has agents doing business in the State of California.

6      19.  Defendants Phillip Miles and Paul Young are individuals and

7  residents of Georgia.  These Defendants are employees of Deutsche Bank and/or

8  DB Alex Brown.  These Defendants are continuously and systematically engaged

9  in business in the State of California, as further described herein, and thus may be

10  found in the State of California, and have agents doing business in the State of

11  California.  Deutsche Bank, DB Alex Brown, Craig Brubaker, Phillip Miles, and

12  Paul Young are sometimes collectively referred to as the "Deutsche Defendants".

13      20.  Defendant American Express Company is a New York corporation

14  with its principal place of business in New York, New York. American Express

15  Company is continuously and systematically engaged in business in the State of

16  California, as further described herein, and thus may be found in the State of

17  California, and has agents doing business in the State of California. American

18  Express Company is licensed to do business in the State of California.

PLAINTIFFS' FIRST AMENDED COMPLAINT          Page 8

EXHIBIT ___1___
PAGE ___37___

1    21.    Defendant American Express Tax & Business Services, Inc. is a

2  Minnesota corporation with its principal place of business in Minneapolis,

3  Minnesota.    American Express Tax & Business Service is continuously and

4  systematically engaged in business in the State of California, as further described

5  herein, and thus may be found in the State of California, and has agents doing

6  business in the State of California.    American Express Tax & Business Service is

7  licensed to do business in the State of California.

8    22.    Defendant Bob Goldstein is an individual and resident of Illinois.

9  This Defendant is an employee of American Express Tax & Business Services,

10  Inc.  This Defendant is continuously and systematically engaged in business in the

11  State of California, as further described herein, and thus may be found in the State

12  of California, and has agents doing business in the State of California.  American

13  Express Company, American Express Tax & Business Services, Inc., and Bob

14  Goldstein are sometimes collectively referred to as the "AMEX Defendants".

15

PLAINTIFFS' FIRST AMENDED COMPLAINT              Page 9

EXHIBIT ____ 1

PAGE ____ 38

1

## III.

2

## BACKGROUND FACTS

3 **A.** **THE DEVELOPMENT OF THE SCHEME TO SELL DIGITAL OPTIONS**

4      **1.**    <u>**About the Deutsche Defendants**</u>

5      23.    Deutsche Bank, founded in 1870, is a joint stock company principally

6 dedicated to financing foreign trade.[1] Deutsche Bank does business in major

7 financial and banking markets in Germany, Europe and the rest of the world; and,

8 as of December 31, 2002, had total assets of approximately $1.25 trillion.

9 Deutsche Bank offers various investment, financial and related products and

10 services to consumer and corporate clients worldwide. Deutsche Bank has roughly

11 67,700 employees and more than 13 million customers in 76 countries worldwide;

12 more than half of Deutsche Bank's staff works outside of Germany.

13      24.    Deutsche Bank claims to provide its private clients with all-round

14 service extending from account-keeping and cash and securities investment advice

15 to asset management. In addition, Deutsche Bank claims to have a leading position

16 in international foreign exchange, fixed-income and equities trading.

---

[1] All of the information set forth in this section is taken from the website of Deutsche Bank. *See* <http://www.db.com/> *Welcome to Deutsche Bank* (last visited February 27, 2004).

PLAINTIFFS' FIRST AMENDED COMPLAINT          Page 10

EXHIBIT 1
PAGE 39

1    25.    Deutsche Bank holds itself out to be a pre-eminent provider of

2    liquidity in the world's foreign exchange markets and a recognized leader in all

3    aspects of foreign exchange.  According to its website, it is consistently ranked as

4    one of the top three global foreign exchange providers by *Euromoney* Magazine's

5    industry standard annual Foreign Exchange Poll, both in terms of client perception

6    and market share.

7    26.    Deutsche Bank's Foreign Exchange claims to be committed to the

8    core values of client focus and innovation that allegedly characterize all its

9    wholesale client businesses. It further claims that its scale is only as important as

10   its ability to find the most creative solution available to *individual* client problems.

11   27.    Deutsche Bank claims that its foreign exchange options franchise is

12   unsurpassed among major players. It further states that its options desk is fully

13   integrated with all parts of its global foreign exchange operations, giving clients

14   24-hour access to a world of *speculative and hedging* opportunities.

15

PLAINTIFFS' FIRST AMENDED COMPLAINT            Page 11

EXHIBIT   1
PAGE   46

1    ## 2.    About AMEX

2    28.   American Express Company, founded in 1850, is a global travel,

3    financial and network services provider.[2]   American Express claims to have

4    enjoyed record income in the First Quarter of 2004 of $865 million.   American

5    Express Tax and Business Services, Inc. ("TBS"), a subsidiary of American

6    Express Company, claims to provide custom solution for small- and mid-sized

7    business and to specialize in serving affluent individuals, including business

8    owners and executives.   TBS assures its clients that they can "count on our parent

9    company, American Express, and its 100-year history of responsible financial

10   management."[3]  TBS also holds itself out as ranked 8th on the *Accounting Today's*

11   List of Top-100 Accounting Firms.[4]

12   ## 3.    About Digital Options

13   29.   An option gives a buyer the right to buy or sell something at a definite

14   price for a definite period of time, regardless of that something's then market price

[2] All of the information set forth in this section is taken from the website of the AMEX Defendants. *See* <http://www.americanexpress.com/>(last visited May 3, 2004).

[3] *See*<http://finance.americanexpress.com/sif/cda/page/0,1641,16048,00.asp>*We Have a History of Creating Highly Satisfied Clients* (last visited May 3, 2004).

[4] *See*<http://finance.americanexpress.com/sif/cda/page/0,1641,16038,00.asp?taxctr advice=tbs>*American Express Tax and Business Services* (last visited May 3, 2004).

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 12

EXHIBIT   1
PAGE     41

1    on the open market.  That "something" may be stock, bonds, commodities (such as

2    coffee or pork bellies), or intangible market valuations such as the Standard &

3    Poors composite value.  Options are said to be "in the money" if the price of the

4    underlying "something" makes exercising the option profitable.  Similarly, options

5    are said to be "out of the money" when exercising the option would result in no

6    gain or a loss.  While options were originally primarily developed as a "hedge"

7    against declines in other investments, "plain vanilla" options have spawned a host

8    of derivatives which sometimes hang by only a slender thread from any underlying

9    investment or in some cases —like here— not at all.

10            30.    Options  may  be  either  "American-style"  or  "European-style,"

11   depending upon whether the option purchaser has the right to exercise the option at

12   any time before expiration or *only upon* the designated expiration date.  For

13   example, assume an investor buys a "call" option on 1000 shares of ABC stock

14   with a "strike price" of $100 and an expiration date of July 16, 2003.  This option

15   gives the investor the right to purchase 1000 shares of ABC for $100.  Under an

16   American-style option, the option holder can exercise the option by purchasing the

17   shares at any time he chooses prior to July 16, 2003.  Under a European-style

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 13

EXHIBIT ___1___
PAGE ___42___

1  option, the option holder can only elect to exercise the option on July 16, 2003, and

2  perhaps, as was true in this case, only at a certain time on that date.

3      31.    Digital Options are "digital" in the sense that the investor wins or

4  loses a pre-determined amount in full, *but only* if the strike price is met—thus, the

5  option is either on or off, like a digital (binary) 1 or 0.  As a result, Digital Options

6  provide an investor with the same payout no matter how far above the strike price

7  the underlying price goes.  For example, a Digital Option may look as follows:  an

8  investor will receive $1,000 if ABC Corp. closes at or above $12 per share on June

9  24, 2003. If the price of ABC Corp. is at or above $12 per share on the closing

10  date, the investor is paid $1,000.  If ABC does not close at or above $12 per share,

11  the investor gets nothing and loses what he originally paid for the option. No

12  matter the outcome, however, stock in ABC Corp. never changes hands.  Digital

13  Options are, in reality, nothing more than wagers that a certain commodity or

14  equity price will be at or beyond (or beneath) a given price on a certain date.

15      32.    Digital Options are ordinarily less expensive to purchase than

16  standard options.  A Digital Option price is influenced by many of the same factors

17  as any other option, such as the price of the underlying commodity, the exercise

18  price, the time to maturity, the volatility of the underlying commodity, and short-

PLAINTIFFS' FIRST AMENDED COMPLAINT       Page 14

EXHIBIT____1

PAGE____A3

1   term interest rates.   A key disadvantage of Digital Options is a limited profit

2   potential.

3       **4.**   **Defendants Develop the Plan to Market the FX Contracts**

4       33.   The plan to market the foreign exchange digital options contracts (the

5   "FX Contracts") was developed by the Deutsche Defendants and others in the mid-

6   to late-90s. Upon information and belief, the participants included Paul Daugerdas,

7   a partner at Jenkens & Gilchrist, P.C. ("Jenkens"), and David Parse and certain

8   other unknown individuals with the Deutsche Defendants. Prior to 1994,

9   Daugerdas was employed by Arthur Anderson as *inter alia* the Partner in charge of

10  the Futures and Options Tax Practice. From 1994 to December 28, 1998, he was a

11  partner at the law firm of Altheimer & Gray in Chicago, Illinois, where he was

12  Chairman of its Tax Department. Since December 29, 1998, Daugerdas has been a

13  Partner in Jenkens' Chicago office.

14      34.   From 1991 until October 1999, Daugerdas apparently marketed a tax

15  strategy in which a prospective client borrows a treasury security, sells the security

16  short, and then contributes the proceeds to a partnership in exchange for a

17  partnership interest.  Although the issue is hotly contested,[5] Daugerdas contends

---

[5] *See The Diversified Group, Inc vs. Daugerdas and Jenkens & Gilchrist*, 139 F. Supp. 2d 445 (S.D.N.Y. 2001).

PLAINTIFFS' FIRST AMENDED COMPLAINT             Page 15

EXHIBIT   1
PAGE   44

1    that he independently developed the idea of substituting options in place of

2    treasuries sometime in 1995 or 1996.  He claims that after the House Ways and

3    Means Committee of the United States Congress proposed legislation in October of

4    1999 that would, if passed, adversely impact the use of treasuries in the short-sale

5    strategy, he began to employ the option strategy for his clients.

6          35.    The result was a tax strategy where a taxpayer purchases and writes

7    options and transfers these option positions to a partnership.  As a result, the

8    taxpayer claims that the basis of the taxpayer's partnership interest is increased by

9    the cost of the purchased options, but is not reduced by the taxpayer's obligation

10    with regard to the options written. The use of European-style digital options in this

11    transaction is essential because it permits significant leverage to be obtained at

12    relatively modest cost and minimum risk.

13          36.    Indeed, to hold the risk and the resulting profit potential to a

14    minimum, the Defendants structured the FX Contracts as follows: Each client

15    entered into two opposing transactions[6] - one where the client would be PAID if

---

[6] The two transactions, although purportedly independent, were actually neither independent nor even transactions.  Each client and the Deutsche Defendants entered into one form contract memorializing both what was bought and what was sold, and without providing further collateral the client could not transfer the positions separately.  Further, the FX Contracts were not something traded on any

PLAINTIFFS' FIRST AMENDED COMPLAINT          Page 16

1   the spot rate on a particular foreign currency[7] was at or below a certain rate, and

2   one where the client would have to PAY OUT if the spot rate was at or below a

3   certain rate.  The two rates that were set (one where the client would be PAID and

4   one where the client would PAY OUT) were different by only *fractions of a penny.*

5   On all of the FX Contracts, the trigger[8] occurred when the spot rate on the

6   underlying currency pair (Japanese Yen vs. U.S. Dollar, Euro vs. U.S. Dollar, or

7   Canadian Dollar vs. U.S. Dollar) was at or below a specific spot rate *on a certain*

8   *date at a certain time.* Thus, there was almost no chance of only one position being

9   acted upon.  Either the spot rate would be above both, so neither were acted upon,

10  or the spot rate would be below both, so both were acted upon.

11      37.     To further ensure control of the transaction (that either both or neither

12  one were acted upon), the ability to determine when and if the event was triggered

13  was retained by Deutsche Bank, with the stipulation that Deutsche Bank, as the

---

recognized exchange but were simply a matter of private contract between the participants. Finally, neither party had any rights to take possession of the "underlying currency." As a result, the FX Contracts amounted, in actuality, to a contractual wager (*i.e.*, a "bet") based on movements in foreign currency prices, without any real possibility of foreign currency ever changing hands between the parties.

[7] Foreign currency was used so that the loss claimed could be either capital or ordinary, depending on the need, under § 988 of the Internal Revenue Code.

[8] The "trigger" is an event that causes a payoff with respect to digital options.

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 17

EXHIBIT ___
PAGE ___ 46

1  "calculation agent", could choose to accept or disregard any spot rate.  When you

2  combine these two elements - the incredibly close proximity of the trigger spot

3  rates (hundredths of a penny apart) and the ability to choose the spot rate that

4  determines if the trigger occurred - the transactions had virtually no risk of just one

5  of the paired transactions being exercised.  Buried in a footnote in some, but not

6  all, of Jenkens' opinion letters issued after the transaction was completed, Jenkens

7  referred to the small chance of this occurring as "lottery-type" winnings.

8      38.   The Defendants, and others not named as defendants in this case,

9  structured the FX Transactions so that the total of fees to them and others was

10  between five and one-half percent (5.5%) and nine and one-half percent (9.5%)[9] of

11  the tax savings the client desired to achieve.  Of this amount, between one percent

12  (1%) and five percent (5%) went to the Deutsche Defendants as the "spread"

13  between the two positions in the FX Contract (*i.e.*, the difference between what

14  was paid for buying one position and what was received for selling the other), three

15  percent (3%) went to Jenkens for having "developed" the FX Contract as a tax

16  strategy and writing an opinion letter on the transaction,[10] and one and one-half

17  percent (1.5%) went to others (the "Marketing Participants"), who participated in

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 18

EXHIBIT __1__
PAGE ____47____

1   the transaction by introducing and recommending the FX Contracts, as part of

2   various tax strategies, to long-time clients who trusted them.   The Marketing

3   Participants included *inter alia* the Deutsche Defendants, the AMEX Defendants,

4   and others known and unknown.   The FX Contract tax strategy was sometimes

5   marketed under *inter alia* the name "COBRA" (*i.e.*, Currency Options Bring

6   Reward Alternatives).   In this case, the Deutsche Defendants not only designed and

7   sold the FX Contracts, but also directly marketed and promoted the tax strategy to

8   the Plaintiffs, including giving advice on the tax aspects of the strategy.   Indeed,

9   the tax strategies were marketed and promoted as a proprietary Deutsche Bank

10   strategy.

11      39.   The Barron Plaintiffs entered into the FX Contracts described in

12   paragraph 80 herein and the Wolfson Plaintiffs, Johnson Plaintiffs, and Daviscourt

13   Plaintiffs entered into the almost identical FX Contracts described in paragraph 79

14   herein.   In this case (with respect to all of the Plaintiffs), the options expired "out

15   of the money," thus allowing the Deutsche Defendants to retain the premiums it

16   had received on the FX Contracts.   Plaintiffs also paid fees to Jenkens, the

17   Deutsche Defendants and the AMEX Defendants.

---

[10] Exclusive of any amount paid for an opinion letter from someone other than
Jenkens.

PLAINTIFFS' FIRST AMENDED COMPLAINT                           Page 19



EXHIBIT 1
PAGE 48

1      40.    Defendants, singly and in concert, directly or indirectly, engaged in a

2   common plan, transaction and course of conduct described herein in connection

3   with the purchase and sale of the FX Contracts, pursuant to which they knowingly

4   or recklessly engaged in acts, transactions, practices and a course of business

5   which operated as a fraud upon Plaintiffs.  Further, Defendants made various false

6   statements of material fact, and omitted to state material facts which made

7   statements misleading, to Plaintiffs.

8      41.    The purpose and effect of Defendants' plan, transaction, and course of

9   conduct was to generate fees by promoting and serving as a counter-party for the

10  FX Contracts as part of an alleged tax-savings strategy.[11]

11     42.    Defendants either had actual knowledge of the misrepresentations and

12  omissions of material fact set forth herein, or acted with reckless disregard for the

13  truth in that they failed to ascertain and disclose the true facts, even though such

---

[11] The strategy entered into by the Wolfson Plaintiffs, Johnson Plaintiffs, and
Daviscourt Plaintiffs is referred to herein as the "COBRA Strategy".  The strategy
entered into by the Barron Plaintiffs was slightly different in form (but not in
substance) and is referred to herein as the "COBRA/SWAP Strategy".  The
COBRA Strategy and the COBRA/SWAP Strategy both utilized foreign digital
options in the same manner and passed the artificial "loss" created by the FX
Contracts through various entities in the exact same manner.  The COBRA
Strategy and the COBRA/SWAP Strategy are sometimes collectively referred to
herein as the "Strategies".

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 20

EXHIBIT  1
PAGE  49

1  facts were available to them.  In this regard, Defendants' acts and omissions

2  included *inter alia*:

3    •    Failing to disclose the true likelihood that the FX Contracts would pay

4         out;

5    •    Failing to disclose that the Defendants retained virtually unlimited

6  discretion to determine whether the Digital Options would pay out and therefore,

7  could ensure, if they so chose, that the Digital Options would *not* pay out;

8    •    Failing to apprise the Plaintiffs that the FX Contracts had no

9  reasonable possibility of a profit (certainly not in excess of the fees paid), and that,

10  in reality, the net effect of the Digital Options they were purchasing and selling

11  was nothing more than a wager, like buying a lottery ticket, on where the price of

12  the underlying currency would be at exactly 10 a.m. on a given date thirty days

13  hence; and

14    •    Failing to disclose that the Strategies were Jenkens' Strategies and

15  affirmatively stating that the Strategies were the Deutsche Defendants' own

16  proprietary strategies.

17    43.    As a result of and in reliance on these misrepresentations, omissions,

18  and promises, the Plaintiffs purchased the FX Contracts and engaged in the

19  Strategies.

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 21

EXHIBIT ___1___
PAGE ___50___

1       44.     Had Plaintiffs known of the material adverse information which

2   Defendants did not disclose, they would not have purchased the Digital Options or

3   engaged in the Strategies.

4       45.     The Defendants owed duties to the Plaintiffs.  These duties included

5   the duty to:

6       •       Exercise prudence, caution and care in recommending and entering

7   into the FX Contracts for and with the Plaintiffs; and

8       •       Exercise their responsibility to deal fairly and in good faith and their

9   fiduciary responsibilities of care and loyalty to the Plaintiffs.

10      46.     Defendants intended to deceive the Plaintiffs, as evidenced by the

11  aggressive push the Defendants took, directly and through the Marketing

12  Participants, to convince the Plaintiffs to enter into the FX Contracts and engage in

13  the Strategies.  In combination with the relatively short time the Plaintiffs were

14  given to consider the transactions and the transactions' complete failure to achieve

15  their intended purpose, there is no possible explanation for the Defendants'

16  behavior other than intentional deceit.

17      47.     An examination of the movement, according to Bloomberg, of one of

18  the underlying currencies  -the Euro- related to the FX Options illustrates their

19  highly speculative nature:

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 22

EXHIBIT ___1___
PAGE   ___51___



1    48.   As shown, from December 31, 1998, to December 31, 1999, the Euro

2    traded between 1.1899 (on January 4, 1999) and 0.999 (on December 3, 1999).

3    49.   In addition, under the Digital Option Trade Confirmation, Deutsche

4    Bank, as the Calculating Party, was authorized to use discretion in selecting the

5    spot rate on expiration.  The range of currency rates available to the Calculating

6    Party makes the selection of the Defining Event subject to the pleasure of the

PLAINTIFFS' FIRST AMENDED COMPLAINT                Page 23

EXHIBIT ____
PAGE ____

1    Calculating Party.  As can be seen by the quotes for the Euro in May 2003, the

2    Calculating Party can pick from a range of spot rates larger than and including the

3    narrow range of "winning" spot rates defined in the Digital Options.  Thus, it is

4    exclusively the Calculating Party who determines whether the Digital Option pays

5    out.[12]

6          50.    For example, there are approximately twelve (12) bid spot rates listed

7    as of 8:21 A.M. on May 8, 2003.  According to Bloomberg, the spot rates range

8    from $1.1463/Euro (Den Norske Bank) to $1.1468/ Euro (RBS, London):

---

[12] The fact that the FX Contract does not specify whether it is the "bid" or the
"ask" rate to be used, which are also further apart than the spread of this "sweet
spot," also allows the Deutsche Defendants to decide who "wins" and who "loses."

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 24

EXHIBIT ___1___
PAGE    53

51. As an example, the strike price for one contract involving options purchased on the Euro was \$1.0187/Euro and the strike price for the option sold was \$1.0186/Euro—a spread of 1/100[th] of a penny. Given that the spread of spot rates at any given time exceed the decimal specificity of the strike price, the pay out of the Digital Options was clearly wholly up to the Deutsche Defendants.

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 25

EXHIBIT    1
PAGE       54

1    52.    It is evident that Defendants chose to defraud the Plaintiffs for personal

2    gain in the form of outrageous fees from unsuspecting "clients." These transactions

3    to defraud were perpetrated through Defendants' discrete acts of misrepresentations,

4    representatives of which are previously alleged.

5    **B.    THE STRATEGIES TEAM IS FORMED AND THE SCHEME IS PUT IN ACTION**

6    53.    Based on information and belief, Jenkens recruited the Defendants as

7    Marketing Participants to assist them in marketing the Strategies to the wealthy

8    clients of the Defendants and others.

9    54.    Why did Jenkens recruit the Defendants to sell the Strategies? Simply

10   stated, people trust their accountants and advisors.    Wealthy clients place a

11   tremendous amount of trust and faith in the advice and recommendations of their

12   accountants and advisors.  Accountants and advisors know their clients' finances

13   better than just about anyone else.  As a result, Jenkens knew that accounting and

14   investment firms had an established market for the Strategies.  Jenkens knew that if

15   the accounting and investment firms recommended the tax shelter to their wealthy

16   clients, the clients would more than likely do the deal without questioning the details

17   of the strategy.

18   55.    Based on information and belief, the team of Jenkens and the Deutsche

19   Defendants, along with the AMEX Defendants, entered into an arrangement where

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 26


EXHIBIT ___1
PAGE ___55

1    each would receive a certain portion of the fee for each Strategy sold.  The fee to

2    each of these Defendants was not based on an hourly rate or time spent working on

3    the deal; rather, the fee was based solely on "the size" of the transaction.  In other

4    words, the bigger the deal, the larger the fee shared by the Defendants.

5        56.    Based on information and belief, Jenkens prepared an opinion letter

6    opining as to the propriety of their Strategies long before the Defendants began to

7    solicit clients.  The opinion letter was a "canned," "prefabricated" form that was

8    utilized, with minor changes based on the particular client, for each and every

9    Strategy deal sold across the country.

10       57.    Based on information and belief, the Strategies team devised and

11   implemented a well-planned sales strategy that focused on leveraging trust and

12   confidence, coupled with pressure as needed, to sell the Strategies to trusting clients.

13   The Defendants identified the potential wealthy clients and set up meetings to

14   discuss the Strategies.  The Defendants, capitalizing on the close-relationship they

15   had with the Individual Plaintiffs, gave the sales presentation in this case.  The crux

16   of the sales pitch was that a major law firm, Jenkens & Gilchrist, would prepare an

17   "independent" opinion letter confirming the propriety of the Strategies, which would

18   supposedly provide insurance in the event of an audit.

19

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 27

EXHIBIT    1
PAGE    56

1    C.    THE STRATEGIES TEAM SOLICITS THE BARRON PLAINTIFFS

2         58.    The Deutsche Defendants directly solicited the Barron Plaintiffs.  The

3    Barron Plaintiffs were clients of the Deutsche Defendants long before the Deutsche

4    Defendants approached them with the COBRA/SWAP Strategy.  In 2001, Robert

5    Barron placed a large sum of money into an existing account with Deutsche Bank.

6    Shortly after this deposit, Deutsche Bank began to aggressively promote an

7    "Alternative Investment Strategy Product" to the Barron Plaintiffs (*i.e.*, the

8    COBRA/SWAP Strategy).  This resulted in several meetings between the Barron

9    Plaintiffs and various representatives of Deutsche Bank, culminating in

10   representatives of Deutsche Bank (including Paul Young and two other Deutsche

11   Bank representatives) traveling from Atlanta, Georgia to the Barron's home in

12   California to make a formal presentation to them of the COBRA/SWAP Strategy.

13   Defendant Phillip Miles participated in the California meeting telephonically.  In the

14   California meeting (as well as the other meetings), Mr. Young represented that the

15   tax strategy was a "Deutsche Bank strategy".  Although Mr. Young was clearly the

16   "salesman", he quickly turned the discussions over to Mr. Miles to explain the tax

17   issues of the strategy because Mr. Miles was the "accounting expert" at Deutsche

18   Bank for the complicated COBRA/SWAP Strategy.  Throughout the process,

19   Deutsche Bank repeatedly told the Barron Plaintiffs that this tax strategy was a

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 28

EXHIBIT _____
PAGE ___57___

1    proprietary strategy of Deutsche Bank's, which Deutsche Bank was making

2    available to only a select group of individuals.  Tellingly, Deutsche Bank instructed

3    and, in fact, demanded that the Barron Plaintiffs not discuss any aspect of the

4    COBRA/SWAP Strategy with any other individual because of the highly proprietary

5    nature of the tax strategy.  As a result, the Barron Plaintiffs were precluded from

6    seeking advice from other legal and/or accounting professionals.

7        59.    Mr. Young also touted Deutsche Bank's New York group as the "best

8    in the world" and assured the Barron Plaintiffs that "they would take good care of

9    their investments."  Mr. Young also indicated that Deutsche Bank had used this

10   strategy for many clients.  After Mr. Young convinced the Barron Plaintiffs to

11   participate in the COBRA/SWAP Strategy, Mr. Miles took the lead in making sure

12   the COBRA/SWAP Strategy was implemented the way Deutsche Bank wanted it to

13   be.  Deutsche Bank representatives were at virtually every meeting that involved

14   implementing the tax strategy.  Indeed, the Deutsche Defendants discussed every

15   aspect of the COBRA/SWAP Strategy with the Barron Plaintiffs, including

16   discussing and analyzing the alleged tax savings benefits of the strategy.

17       60.    After Mr. Young "sold" the tax strategy to the Barron Plaintiffs, Mr.

18   Miles repeatedly assured the Barron Plaintiffs that the COBRA/SWAP Strategy was

19   a legitimate, legal tax savings strategy.  Mr. Miles introduced the Barron Plaintiffs to

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 29

EXHIBIT___1___
AGE    58

1    Paul Daugerdas of Jenkens & Gilchrist and explained that he had worked with Mr.

2    Daugerdas at Arthur Anderson at one time.   The Deutsche Defendants told the

3    Barron Plaintiffs that the COBRA/SWAP Strategy offered them a reasonable

4    opportunity to make a substantial profit on the foreign currency options and at the

5    same time allowed them to take advantage of a legal "loophole" in the tax code to

6    reduce their tax liability.  Both Mr. Miles and Mr. Daugerdas explained that Jenkens

7    would prepare an "independent" opinion letter confirming the validity of the

8    COBRA/SWAP Strategy and "guaranteed" the Barron Plaintiffs that, due to the

9    opinion letter, they would be protected from penalties being assessed by the IRS.

10   The Barron Plaintiffs are successful business people; however, they do not have

11   knowledge about complex tax and legal matters.  The Barron Plaintiffs relied on the

12   Defendants for their "expertise".

13       61.    After agreeing to participate in the COBRA/SWAP Strategy, the Barron

14   Plaintiffs told the Defendants that they wanted their personal CPA to prepare their

15   2001 tax return reflecting the COBRA/SWAP Strategy.  The Barron Plaintiffs were

16   advised to not use their personal accountant.   To the contrary, the Defendants

17   demanded that the Barron Plaintiffs use one of several specific accountants (which

18   included Robert Goldstein), because these accountants "understood digital SWAPS",

19   "knew how the entities were set up", and "knew how the return needed to look".

PLAINTIFFS' FIRST AMENDED COMPLAINT                        Page 30

EXHIBIT  1
PAGE  59


1    62.    The Barron Plaintiffs were never told that the COBRA/SWAP Strategy

2    was actually created and designed, and would be implemented by Jenkens.  Indeed,

3    the Barron Plaintiffs were never made aware that Jenkens was providing a legal

4    opinion as to the validity of *its own tax shelter,* which as a result was not in fact an

5    "independent" opinion letter.

6    63.    The Deutsche Defendants' role in the scheme was not limited to giving

7    investment advice to the Barron Plaintiffs.    To the contrary, the Deutsche

8    Defendants discussed all aspects of the COBRA/SWAP Strategy with the Barron

9    Plaintiffs, including the alleged tax benefits of the tax strategy.    The Deutsche

10   Defendants represented to the Barron Plaintiffs that they had an opportunity to make

11   a substantial amount of money on the FX Contracts and that, at the worst, they

12   would create large losses for tax purposes that would largely eliminate or offset their

13   expected substantial capital gain or income.

14   **D.    THE STRATEGIES TEAM SOLICITS THE WOLFSON PLAINTIFFS**

15   64.    The Wolfson Plaintiffs had an existing professional relationship with

16   BDO Seidman, LLP ("BDO") and had utilized BDO for services in the past.  In fact,

17   BDO, through its employee, Frank L'Engle, had assisted the Wolfson Plaintiffs with

18   the very transaction that generated the Wolfson Plaintiffs' substantial capital gain in

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 31

EXHIBIT ___1___

PAGE ___60___

1   2000.   Therefore, BDO had intimate knowledge of the finances of the Wolfson

2   Plaintiffs and were trusted fiduciaries of the Wolfson Plaintiffs.

3        65.    Without any prompting or request by the Wolfson Plaintiffs, BDO,

4   through Mr. L'Engle, exploited its knowledge of the Wolfson Plaintiffs' finances

5   and its position as a trusted fiduciary by approaching the Wolfson Plaintiffs and

6   introducing the COBRA Strategy to them.  Mr. L'Engle told the Wolfson Plaintiffs

7   that this tax savings strategy took advantage of a legal "loophole" in the tax code to

8   reduce tax liability.   The Wolfson Plaintiffs, however, did not engage BDO to

9   execute any aspect of the COBRA Strategy.  BDO was not involved in any aspect of

10   implementing the COBRA Strategy for the Wolfson Plaintiffs, and the Wolfson

11   Plaintiffs did not execute any service agreement for the COBRA Strategy or pay

12   BDO a fee for the COBRA Strategy.

13        66.    The Wolfson Plaintiffs are successful business people; however, they

14   do not have knowledge about complex tax and legal matters.  As a result, shortly

15   after meeting with Mr. L'Engle, the Wolfson Plaintiffs spoke with attorneys at

16   Jenkens.  Jenkens, in turn, referred the Wolfson Plaintiffs to the AMEX Defendants

17   (including Robert Goldstein) and the Deutsche Defendants (including Craig

18   Brubaker).   The AMEX Defendants and Deutsche Defendants reiterated to the

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 32

EXHIBIT ____
PAGE ____

1    Wolfson Plaintiffs that the COBRA Strategy was a legitimate tax savings strategy

2    that took advantage of a legal " loophole" in the tax code to reduce tax liability.

3        67.    None of the Defendants ever told the Wolfson Plaintiffs that the

4    COBRA Strategy was actually created and designed, and would be implemented, by

5    Jenkens.    Rather, the Defendants told the Wolfson Plaintiffs that the COBRA

6    Strategy was a Deutsche Bank strategy.    Indeed, the Wolfson Plaintiffs were never

7    made aware that Jenkens was providing a legal opinion as to the validity of *its own*

8    *tax shelter,* which as a result was not in fact an "independent" opinion letter.

9        68.    The Deutsche Defendants' role in the scheme was not limited to

10   investment advice.    To the contrary, the Deutsche Defendants discussed all aspects

11   of the COBRA Strategy with the Wolfson Plaintiffs, including the alleged tax

12   benefits of the strategy.    For instance, during meetings with the Wolfson Plaintiffs

13   (which were telephonic), the Deutsche Defendants informed them that by forming a

14   partnership to engage in the COBRA Strategy, it was possible to create large capital

15   losses for tax purposes that would largely eliminate or offset their expected

16   substantial capital gain in 2000.    The Deutsche Defendants informed the Wolfson

17   Plaintiffs that the COBRA Strategy would result in either a far smaller loss or profit

18   in real dollars.    The Defendants told the Wolfson Plaintiffs that they could allocate

19   the substantial capital losses to 2000.    Tellingly, the Defendants instructed the

PLAINTIFFS' FIRST AMENDED COMPLAINT                              Page 33

EXHIBIT____1____
PAGE ____62____

1   Wolfson Plaintiffs that they could not discuss any aspect of the COBRA Strategy

2   with anyone because of the highly proprietary nature of the strategy; accordingly, the

3   Wolfson Plaintiffs were precluded from seeking advice from other legal and/or

4   accounting professionals.

5   **E.    THE STRATEGIES TEAM SOLICITS THE DAVISCOURT PLAINTIFFS**

6          69.    The Daviscourt Plaintiffs were introduced to Jenkens and Deutsche

7   Bank shortly after they sold their family-owned business in 2000.  In October 2000,

8   the Daviscourt Plaintiffs met with Erwin Mayer, a partner with Jenkens, who

9   introduced the Daviscourt Plaintiffs to the COBRA Strategy and characterized it as a

10  legitimate tax-savings strategy that Jenkens would endorse.  Mayer explained to the

11  Daviscourt Plaintiffs that Jenkens would prepare an "independent" opinion letter

12  approving and supporting the strategy as a valid and legal tax strategy, which would

13  protect the Daviscourt Plaintiffs in the event of an IRS audit.   Mayer also stated that

14  the COBRA Strategy was also an opportunity to make a huge amount of money and

15  Jenkens had clients that had "hit it out of the park".  The Daviscourt Plaintiffs were

16  under the impression that the Deutsche Defendants would be responsible for

17  implementing the COBRA Strategy and Jenkens would simply provide the

18  "independent" opinion letter.

PLAINTIFFS' FIRST AMENDED COMPLAINT                      Page 34

EXHIBIT ___1___
PAGE ___63___

1       70.   Mayer referred the Daviscourt Plaintiffs to the Deutsche Defendants for

2  the implementation of the strategy.  Although the Daviscourt Plaintiffs wanted to be

3  actively involved in the implementation of the strategy, the Deutsche Defendants

4  made it clear to them that the Deutsche Defendants did not want their participation.

5  For instance, at the outset of the transaction, the Daviscourt Plaintiffs questioned

6  Brubaker about the type of foreign currencies to be used and Mark Daviscourt, who

7  had an interest in foreign currency, told Brubaker that he wanted to pick the foreign

8  currency to be used in his FX Contract.  Brubaker told Mark Daviscourt that he was

9  "flattered" by Mark's interest in foreign currencies, but Mark must allow Brubaker

10  to choose the currency because he was the "currency specialist" and Mark was a

11  "general contractor specialist".  In other words, "Stay out of the way!"  The

12  Deutsche Defendants repeatedly reiterated to the Daviscourt Plaintiffs that the

13  COBRA Strategy was a legitimate tax savings strategy that took advantage of a legal

14  "loophole" in the tax code and that the Deutsche Defendants traded thousands of FX

15  Contracts daily – the Deutsche Defendants were the experts when it came to the

16  COBRA Strategy.  The Deutsche Defendants also assured the Daviscourt Plaintiffs

17  that the odds of a profit on the FX Contracts was better if they entered a long and

18  short option together and that there was a better than 30% chance of doubling their

19  investment (with no discussion of *net* gain).

PLAINTIFFS' FIRST AMENDED COMPLAINT          Page 35

EXHIBIT  1
PAGE   64

1    71.   The Deutsche Defendants' role in the scheme was not limited to

2    investment advice.   To the contrary, as with all the other Plaintiffs, the Deutsche

3    Defendants discussed all aspects of the COBRA Strategy with the Daviscourt

4    Plaintiffs, including the alleged tax benefits of the strategy.   The Deutsche

5    Defendants aggressively promoted the COBRA Strategy to the Daviscourt Plaintiffs.

6    The Deutsche Defendants assured the Daviscourt Plaintiffs that they had the

7    opportunity to make a substantial amount of money on the FX Contracts and that, at

8    the worst, they would create large losses for tax purposes that would largely

9    eliminate or offset their expected substantial capital gains and ordinary income.

10    72.   Once the COBRA Strategy was implemented, Jenkens referred the

11    Daviscourt Plaintiffs to the AMEX Defendants for the preparation of their tax

12    returns to reflect the loss generated by the COBRA Strategy.   Jenkens told the

13    Daviscourt Plaintiffs that the AMEX Defendants had specific expertise in the

14    COBRA Strategy.   Although the Daviscourt Plaintiffs ended up utilizing their local

15    accounting firm, they initially considered using the AMEX Defendants and paid the

16    AMEX Defendants a retainer for services that were never rendered.

17    73.   None of the Defendants ever told the Daviscourt Plaintiffs that the

18    COBRA Strategy was actually created and designed, and would be implemented, by

19    Jenkens.   Rather, the Daviscourt Plaintiffs were told that Jenkens would prepare an

PLAINTIFFS' FIRST AMENDED COMPLAINT                Page 36

EXHIBIT ___ 1

PAGE ___ 65

1    "independent" opinion letter approving and supporting the tax strategy as a legal tax

2    savings strategy, which would protect them in the event of an IRS audit.   The

3    Daviscourt Plaintiffs were never made aware that Jenkens was providing a legal

4    opinion as to the validity of *its own tax shelter,* which as a result was not in fact an

5    "independent" opinion letter.

6         74.   The Defendants told the Daviscourt Plaintiffs that they could allocate

7    the substantial losses generated by the COBRA Strategy to 2000.  The Daviscourt

8    Plaintiffs are successful business people; however, they do not have knowledge

9    about complex tax and legal matters.   The Daviscourt Plaintiffs relied on the

10   Defendants for their "expertise".   As with the other Plaintiffs, the Defendants

11   instructed the Daviscourt Plaintiffs that they could not discuss any aspect of the tax

12   strategy with anyone because of the highly proprietary nature of the tax strategy.

13   Although the Defendants attempted to preclude the Daviscourt Plaintiffs from

14   seeking advice from other legal and/or accounting professionals, the Daviscourt

15   Plaintiffs wanted a second opinion.  Accordingly, the Daviscourt Plaintiffs consulted

16   with another advisor who told them that the transaction was difficult to understand

17   based on the limited information available to the advisor, but if Jenkens, the

18   Deutsche Defendants, and the AMEX Defendants were willing to stand behind it,

19   the transaction must be valid.

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 37

EXHIBIT  1
PAGE  66

F.    **THE STRATEGIES TEAM SOLICITS THE JOHNSON PLAINTIFFS**

75.    The Johnson Plaintiffs were referred to Jenkens & Gilchrist by their long-time local accounting firm. The Johnson Plaintiffs were put in contact with Erwin Mayer of Jenkens and arranged to fly to Chicago to meet with him. At the Chicago meeting, Mayer introduced the Johnson Plaintiffs to the COBRA Strategy and characterized it as a legitimate tax-savings strategy that Jenkens would endorse. Mayer explained to the Johnson Plaintiffs that Jenkens would prepare an "independent" opinion letter approving and supporting the strategy as a valid and legal tax strategy, which would protect the Johnson Plaintiffs in the event of an IRS audit. Mayer then directed the Johnson Plaintiffs to Craig Brubaker of Deutsche Bank and Robert Goldstein of AMEX.

76.    Craig Brubaker and other representatives of the Deutsche Defendants, as well as Robert Goldstein and other representatives of the AMEX Defendants, presented the details of the COBRA Strategy to the Johnson Plaintiffs. The AMEX Defendants and Deutsche Defendants repeatedly reiterated to the Johnson Plaintiffs that the COBRA Strategy was a legitimate tax savings strategy that took advantage of a legal " loophole" in the tax code. The Deutsche Defendants and the AMEX Defendants also assured the Johnson Plaintiffs that they had implemented the COBRA Strategy for their clients "hundreds of times" and the Johnson Plaintiffs'

PLAINTIFFS' FIRST AMENDED COMPLAINT          **Page 38**

EXHIBIT   1
PAGE   67

1   transaction was a "small transaction" compared to the COBRA transactions they

2   typically implement for their clients.

3       77.    None of the Defendants ever told the Johnson Plaintiffs that the

4   COBRA Strategy was actually created and designed, and would be implemented, by

5   Jenkens.  Rather, the Johnson Plaintiffs were told that Jenkens would prepare an

6   "independent" opinion letter approving and supporting the tax strategy as a legal tax

7   savings strategy, which would protect them in the event of an IRS audit.   The

8   Johnson Plaintiffs were never made aware that Jenkens was providing a legal

9   opinion as to the validity of *its own tax shelter,* which as a result was not in fact an

10  "independent" opinion letter.

11      78.    The Deutsche Defendants' role in the scheme was not limited to

12  investment advice.  To the contrary, the Deutsche Defendants discussed all aspects

13  of the COBRA Strategy with the Johnson Plaintiffs, including the alleged tax

14  benefits of the strategy.  For instance, during meetings with the Johnson Plaintiffs

15  (which were telephonic), the Deutsche Defendants represented to the Johnson

16  Plaintiffs that they had the opportunity to make a substantial amount of money on

17  the FX Contracts and that, at the worst, they would create large losses for tax

18  purposes that would largely eliminate or offset their expected substantial capital

19  gains and ordinary income.  The Defendants told the Johnson Plaintiffs that they

PLAINTIFFS' FIRST AMENDED COMPLAINT              Page 39

EXHIBIT ___1___
PAGE     ___68___

1   could allocate the substantial losses to 1999, 2000 and 2001.  The Johnson Plaintiffs

2   are successful business people; however, they do not have knowledge about complex

3   tax and legal matters.  The Johnson Plaintiffs relied on the Defendants for their

4   "expertise".  As with the other Plaintiffs, the Defendants instructed the Johnson

5   Plaintiffs that they could not discuss any aspect of the tax strategy with anyone

6   because of the highly proprietary nature of the tax strategy; accordingly, the Johnson

7   Plaintiffs were precluded from seeking advice from other legal and/or accounting

8   professionals.

9   **G.   THE FEATURES OF THE STRATEGIES**

10   79.   The essential features of the COBRA Strategy (applicable to the

11   Wolfson Plaintiffs, Johnson Plaintiffs, and Daviscourt Plaintiffs) were as follows:

12   a.   First, the Individual Plaintiffs would sell a short option and

13   purchase a long option in almost identical amounts on a foreign

14   currency with different (but narrow) strike prices, each to expire

15   in thirty (30) days.  The cost of the long option, though large,

16   would be largely (although not entirely) offset by the premium

17   earned on the sale of the short option.  The Individual Plaintiffs

18   would form a single-member limited liability company ("LLC")

19   for the purpose of purchasing the options;

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 40



EXHIBIT _____1_____
PAGE _____69_____

1      b.    Second, the Individual Plaintiffs (through the LLCs) would

2            contribute their options to a general partnership formed for the

3            purpose of conducting the COBRA transactions.  After 30 days,

4            the long and short options would expire either "in or out of the

5            money," resulting in a gain or loss, depending upon the exchange

6            rate between the U.S. dollar and the relevant foreign currency at

7            that time;

8      c.    Third, the Individual Plaintiffs would make a capital contribution

9            consisting of cash or other capital assets to the partnership; if

10           cash was contributed, it would then be used to purchase either

11           stocks or foreign currencies (depending on whether a capital or

12           ordinary loss was being "created");

13      d.    Fourth, the Individual Plaintiffs would contribute their interests

14           in the partnership to an S Corporation, which in the Plaintiffs'

15           case was formed solely for COBRA, causing the termination of

16           the partnership as a matter of law; and

17      e.    Fifth, the S Corporation would sell the capital (if stock) or

18           ordinary (if foreign currency) assets contributed by the Individual

19           Plaintiffs over a period of time up to three years.   These assets

PLAINTIFFS' FIRST AMENDED COMPLAINT           Page 41

EXHIBIT __1__
PAGE _____70___

1                    would have an artificially inflated basis and their sale would lead

2                    to a substantial unrealized short term capital loss and/or ordinary

3                    loss.

4       80.    The COBRA/SWAP Strategy (applicable to the Barron Plaintiffs)

5 differed from the COBRA Strategy in only one small respect regarding the initial

6 investment.   The first step of the COBRA/SWAP Strategy required the Barron

7 Plaintiffs to enter into two offsetting "Swaps" (the Long Swap and the Short Swap)

8 requiring the payment and receipt of payments triggered by exchange rates between

9 the Japanese Yen and U.S. Dollar on certain dates.  The payments received and paid

10 on the Long Swap and the Short Swap effectively cancelled each other.   The

11 remaining steps on the COBRA/SWAP Strategy (Steps 2-5) were identical to the

12 COBRA Strategy.

13      81.    Except for the subtle differences in the form of the FX Contracts, the

14 COBRA Strategy and the COBRA/SWAP Strategy were exactly alike.

15      82.    Each of the steps proposed by the Defendants to the Individual

16 Plaintiffs, acting pursuant to an undisclosed arrangement with Jenkens, were to be

17 fully planned in advance to reduce or eliminate tax liability for the Plaintiffs'

18 substantial capital gains.  The Strategies were planned to be carried out in 1999 and

PLAINTIFFS' FIRST AMENDED COMPLAINT         Page 42

EXHIBIT ___1___

PAGE ___71___

1    2000 for the Johnson Plaintiffs, 2000 for the Wolfson Plaintiffs and Daviscourt

2    Plaintiffs, and 2001 for the Barron Plaintiffs.

3        83.    The Defendants advised the Individual Plaintiffs that the basis of their

4    interest in the partnership would be increased for tax purposes by the purchase cost

5    of the Long Swap and the Long Option, but not decreased by the premium earned by

6    Individual Plaintiffs on the Short Swap and the Short Option.  They further advised

7    that, as a result, upon the contribution of the partnership interest to the S Corporation

8    and the sale by the S Corporation of its assets, the S Corporation would realize a

9    large capital or ordinary loss that could be applied to substantially reduce or

10   eliminate the large capital gains or ordinary income realized by the Individual

11   Plaintiffs, thus substantially reducing or even eliminating the Individual Plaintiffs'

12   tax liability.

13       84.    The Defendants, acting pursuant to an undisclosed arrangement with

14   Jenkens, further advised the Individual Plaintiffs that the precise amount of loss to

15   be generated by the Strategies would be chosen beforehand, but should not be a loss

16   so large that it would offset the capital gain or ordinary income entirely.

17       85.    The Defendants informed the Individual Plaintiffs that depending on the

18   exchange rate between the U.S. dollar and the foreign currencies involved in the

19   options transactions, there was a reasonable chance of realizing a pre-tax gain on the

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 43

EXHIBIT____1___
PAGE      72

1   FX Contracts, although a pre-tax loss might also occur.   However, the Defendants

2   assured the Individual Plaintiffs that the tax benefits of the Strategies as a whole,

3   resulting from the creation of losses to offset gains and/or income, far outweighed

4   any losses that might be incurred as a result of the FX Contracts.

5       86.   The Defendants further advised the Individual Plaintiffs that if the

6   Internal Revenue Service ("the IRS") audited their tax returns as a result of the

7   Strategies, the Jenkens' "independent" opinion letter would confirm the propriety of

8   the Strategies and of claiming the resulting losses on their tax returns.   This

9   "independent" opinion letter would enable the Plaintiffs to satisfy the IRS auditors

10   as to the propriety of the tax returns.   On information and belief, Jenkens had already

11   prepared the "canned" and "prefabricated" opinion letters approving the Strategies,

12   and needed only to fill in several blanks for each of the many clients to which they

13   rendered such opinion letters.

14       87.   The Defendants advised the Individual Plaintiffs that the capital and

15   ordinary losses created by the Strategies were legitimate and in accordance with all

16   applicable tax laws, rules, and regulations.   In particular, the Defendants advised the

17   Individual Plaintiffs that the Strategies were not a "sham transaction" that would be

18   ignored or disallowed for tax purposes and that the "independent" opinion letter

19   from Jenkens would confirm this.

PLAINTIFFS' FIRST AMENDED COMPLAINT          Page 44

EXHIBIT ___1___
PAGE   73

1   **H.   THE BARRON PLAINTIFFS ENGAGE IN THE COBRA/SWAP STRATEGY IN**

2   **2001.**

3       88.   In approximately July 2001, the Barron Plaintiffs agreed to engage in

4   the COBRA/SWAP Strategy.  Their decision was based in large measure upon the

5   Defendants' advice, the promised "independent" opinion letter of Jenkens

6   confirming the propriety of the COBRA/SWAP Strategy, and the representations

7   and recommendations of the Defendants during the initial COBRA/SWAP Strategy

8   presentation and thereafter.

9       **1.   The Barron Plaintiffs Form the COBRA/SWAP Strategy Entities**

10       89.   In approximately 2000, the Barron Plaintiffs formed The Barron Family

11   Trust (the "Trust").   On June 20, 2001, the Barron Plaintiffs formed RLB Jen

12   Investors, Inc. for the purpose of carrying out the COBRA/SWAP Strategy.

13       90.   On July 16, 2001, the Barron Plaintiffs formed Jen Trust Partners and

14   RLB Jencourt Partners for the purpose of carrying out the COBRA/SWAP Strategy.

15   RLB Jen Investors, Inc. and Barron Family Trust were the partners of Jen Trust

16   Partners.  RLB Jen Investors, Inc. and Robert L. Barron were the partners of RLB

17   Jencourt Partners.   The Defendants instructed, advised, and orchestrated the

18   formation of RLB Jen Investors, Inc., RLB Jencourt Partners, and JenTrust Partners.

19

PLAINTIFFS' FIRST AMENDED COMPLAINT          Page 45

EXHIBIT ____1____

PAGE ____74____

### 2.    The Swaps

91.    The Deutsche Defendants, in conjunction with the undisclosed assistance of Jenkens, advised and instructed the Barron Plaintiffs to pick the Japanese Yen as the foreign currency and the exact amounts to be invested in each Swap.  Based on information and belief, the Deutsche Defendants and Jenkens had calculated the capital losses the Barron Plaintiffs needed and the swap positions (including the "strike prices" to be used) necessary to achieve the loss before the Swaps were purchased.  The Barron Plaintiffs did as they were told.

92.    On or about July 18, 2001, in accordance with the COBRA/SWAP Strategy and Defendants' instructions and direction, the Barron Plaintiffs, through the Barron Family Trust, entered into two Notional Principal Contracts with Deutsche Bank involving fixed swaps and contingent swaps triggered by the Japanese Yen/U.S. Dollar exchange rate. The contracts with Deutsche Bank required the Barron Plaintiffs, through Barron Family Trust, to enter into two Notional Principal Contracts (*i.e.*, the Long Swap and the Short Swap).  The Long and Short Swaps were reflected in a single document.

93.    According to the Long Swap, payments were to be made between Deutsche Bank and the Barron Plaintiffs based upon a notional principal amount of $34,000,000.  These payments were to be made and received on July 26, 2001 and

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 46

EXHIBIT  1
PAGE  46

1    August 13, 2001. The Barron Plaintiffs payments were fixed and were calculated by

2    multiplying the notional principal amount (*i.e.*, $34,000,000) by 260%. Deutsche

3    Bank's payments were contingent and were calculated by multiplying the notional

4    principal amount by 310.625%. The July 26, 2001 payment by Deutsche Bank was

5    required only if the Japanese Yen/U.S. Dollar exchange rate on July 24, 2001 was

6    greater than or equal to 128.00 Japanese Yen per 1.0000 U.S. Dollar. The August

7    13, 2001 payment by Deutsche Bank was required only if the Japanese Yen/U.S.

8    Dollar exchange rate on August 9, 2001 was greater than or equal to 129.10

9    Japanese Yen per 1.000 U.S. Dollar. As consideration for entering into the Long

10   Swap, the Barron Plaintiffs paid a "yield adjustment fee" of $17,000,000.

11       94.    According to the Short Swap, payments were also to be made between

12   Deutsche Bank and the Barron Plaintiffs based upon the same notional principal

13   amount of $34,000,000. These payments were to be made and received on July 26,

14   2001 and August 13, 2001. This time, Deutsche Bank's payments were fixed and

15   were calculated by multiplying the notional principal amount (*i.e.*, $34,000,000) by

16   260.625%. The Barron Plaintiffs' payments were contingent and were calculated by

17   multiplying the notional principal amount by 310%. The July 26, 2001 payment by

18   the Barron Plaintiffs was required only if the Japanese Yen/U.S. Dollar exchange

19   rate on July 24, 2001 was greater than or equal to 128.02 (a mere .02 greater than the

PLAINTIFFS' FIRST AMENDED COMPLAINT                    Page 47


EXHIBIT ___1___
PAGE ___76___